
RECEIVED
2014 MAR 31 PM 4: 39
U.S. DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO, FLORIDA

United States District Court

Middle District of Florida

Orlando Division

Jeannette Martello

Plaintiff

6:12-CV-1304-ORL-22-GJK

v.

Product Quest Manufacturing, LLC; et al.,

Defendant(s)

# PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE EVIDENCE AND TESTIMONY

## Motion in Limine No. 1: Defendants Intentionally Mispresent the Facts to the Court

Defendants have intentionally misrepresented material facts to the Court in the past and they continue to do so now. In her declaration, Plaintiff factually proved that Defendants' lawyer intentionally misrepresented that Product Quest

Manufacturing (hereinafter "PQM") had moved on several locations and that papers were "scattered throughout warehouses." Further fraud has been perpetrated upon The Court and upon Plaintiff. In their Answer, Defendants made false representations that PQM "have had an oral or implied vendor agreement with Walgreens Company." (**Exhibit 1,** paragraph 47, page 7 of 16) During the March 11, 2014 hearing, this lie was uncovered by The Honorable Judge Kelley who questioned Defendants' attorney Rob Norway and found out that an actual written vendor agreement between Walgreens and PQM exists.

Intentional false representations about Walgreens' purchase orders have been told by PQM principal Todd Kwait as early as 2007 when he wrote that "hard purchase orders are not generated by email or any other sort of transmission." **Exhibit 2.** PQM Chief Financial Officer Bill Jennings furthered this charade during his deposition testimony. (**Exhibit 3**, lines 4 through 9 of page 10 of Jennings' partial transcript). In actuality, according to EDI sales specialist for True Commerce, the software used by PQM, purchase orders can be saved in .pdf form, downloaded and printed quite easily. **Exhibit 4.** A true and complete copy of the attachments sent to Plaintiff by True Commerce are attached as **Exhibit 5.** Defendants' misrepresentations continue. Each will be dealt with point by point.

1. Plaintiff produced nearly 1000 emails in native email format with an .msg extension from her martello@skindeepworld.com and

drmartello@gmail.com accounts. Note the attached email from Rob Norway acknowledging that .pst format that Norway requested. **Exhibit 6.** Plaintiff emailed Debi Robins (secretary for both Rob Norway and Rick Mitchell) to ensure that Defendants could open up the files uploaded to their ftp site before Plaintiff spent the next nearly three days uploading hundreds of emails. **Exhibit 7.** Ms. Robins responded via email that she was able to open up the file. **Exhibit 8.** Therefore, the files that were uploaded were easily accessible in accordance with The Federal Rules of Civil Procedure.

During the uploading process, emails were sent to Ms. Robins to verify that the compressed files were also able to be viewed and opened. No response was had. Plaintiff emailed Ms. Robins on three separate occasions regarding the WinZip compressed files. **Exhibit 9.** In order to cover all bases, three separate CD's were overnighted to Defendants during discovery to comply with this discovery request in accordance with The Court's Orders. **Exhibit 10.**

Plaintiff has not been able to access her Hotmail account since the last time it was hacked last year when she was informed by a colleague that he had been spammed yet again by the Hotmail account. **Exhibit 11.** Microsoft deactivated the account and efforts to gain access to the account have been fruitless. **Exhibit 12.** Lack of access to Hotmail accounts have

been documented in several Federal lawsuits. **Exhibit 13.** This is something that is a frequent occurrence according to Robert Rase, computer expert. **Exhibit 14.** The Hotmail account was used only rarely by Martello in correspondence with PQM. In fact, Defendants did not produce a single email that originated from Plaintiff's Hotmail account. Plaintiff produced a paper copy of a single email from her Hotmail account.

According to the *Teledyne* case from the Middle District of Florida (*Teledyne Instruments v. James L. Cairns, et al*, No. 6:12-cv-854-Orl-28TBS, M.D. Fla. October 25, 2013), Plaintiffs were not required to produce electronically stored information (hereinafter "ESI") in more than one format. According to The Honorable Magistrate Judge Thomas B. Smith, "unless the court orders otherwise, a party need not produce the same ESI in more than one form." Federal Rules of Civil Procedure 34(b)(2)(E)(iii).

Defendants' attorney Robert Norway initially requested emails in *.pst format* which is the .msg native email format of Outlook. This format preserves the most metadata possible. **Exhibit 15.** After Defendants received these hundreds of emails in .pst (.msg native email format), they changed their minds and asked for *.pst file format* which is completely different and which changes the metadata. Plaintiff owned a Microsoft Exchange Server 2003 on which her emails were stored and backed up.

Proof that she had a server during this time period is evident through the many emails that mention the server. **Exhibit 16.**

Robert Rase, Martello's computer expert who specializes in data recovery, states that .pst files were not automatically kept on individual computers during the time that Martello had a server. There are several space and corruption considerations for doing this. All of these reasons are documented in the excerpts from the book entitled, *Microsoft Exchange Server 2003* written by Jim McBee. **Exhibit 17.** Plaintiffs provided exactly what Defendants asked for in the *.pst format* that they requested.

2. Much time was spent on discussion of the January 8, 2007 "Demand" Letter and any related emails during the March 11, 2014 hearing. Plaintiffs have but a single copy of a letter that was cut and pasted into an email that was sent to Plaintiff in 2007. This letter was already produced and is present at Bates number 652 to 656. **Exhibit 18,** line 24 of page 79 of March 11, 2014 hearing).

Defendants list Any Related Emails here as well even though the Declaration of Todd Kwait makes it clear that he was never contacted again by Ms. Walls. **Exhibit 19.**

3. Receipts for travel and other expenses. The Operating Agreement clearly notes that travel and other expenses were to be reimbursed by The Company.

4. Tina Walls' Attorney File. Production of this will depend on what The Honorable Judge Gregory J. Kelly's orders. From what it sounded like at the March 11, 2014 hearing, he will not allow the attorney client privilege to be violated.

5. Bradley Watts' emails. Plaintiff asserts the Florida accountant client privilege.

6. Magazines, Recordings, videos, other media, and advertising for Martello's SKIN DEEP ventures. The fact that Defendants are creating a laundry list and misrepresenting that certain items have not been produced is apparent by this request. Defendants' attorney Rob Norway had Martello publish sections from various issues of SKIN DEEP magazine that he had in hand during her continued deposition on January 31, 2014, the deposition that was continued by Defendants even though The Court denied Defendants' Motion for a Continuation of same.

### Motion in Limine No. 2: As Discussed in Motion in Limine No. 1, All Emails were Produced in The Proper Format

With respect to email evidence. Plaintiff produced nearly 1000 emails in native email format or .pst format that preserved the most metadata possible with an .msg extension created by the Outlook application. **Exhibit 20.** During her

deposition, Martello was confronted by several emails put in front of her by Defendants' attorney Rick Mitchell who acknowledged during deposition that they didn't look right. Mitchell's response was "not to worry" about them. **Exhibit 21.**

Plaintiff produced all of her emails using more keywords to supply emails in *.pst file format* which had to be created for the first time ever for Defendants' second discovery request for the same ESI in a different format which is a violation of the *Teledyne* decision listed above. This new *.pst file format* amounted to 3258 pages of emails that were produced when Defendants supplied less than 150 emails to Plaintiffs. Most notably, Defendants withheld and concealed certain emails that were damaging to Defendants' side, including, but not limited to the December 27, 2005 email in which Defendant Regan explained the ambiguous cost formula term that is used "industry" wide to explain "how every retailer in America works" (**Exhibit 22,** volume II, page 124, lines 11 to 15; page 118, lines 5 to 7). This cost formula term which was explained by Regan's email ultimately appeared in the Article III, section C of the Operating Agreement. The fact that these emails during this contract negotiation time period and thereafter were intentionally withheld or destroyed by Defendants is apparent by the fact that other employees' emails from this same time period were produced by Defendants. **Exhibit 23.**

Defendants make a big point over the words "smoking gun" on the header of a single email. Plaintiff Martello never said that the email had been modified, because he had not been modified. Plaintiffs, on the other hand, did not white out entire email addresses and passages like Defendants did. In the attached litigation hold email from December 15, 2010, one can see that an entire section has been "whited out" without explanation or documentation on a privilege log since no privilege existed. **Exhibit 24.**

As documented above and throughout the internet as well as via excerpts from Microsoft, Plaintiff produced her emails in "their original electronic format" which preserved the most metadata possible. The fact that this ESI email request is a "wild goose chase" became obvious when Defendants' own expert O'Toole acknowledged that he didn't see a difference between the content of the .txt based email versus the content of the .msg based email (**Exhibit 25,** lines 1 through 13, page 9 of O'Toole's deposition). This entire ESI discovery tactic has been used to harass Plaintiff as a dilatory discovery tactic and, ultimately, be used by Defendants in a way to prevent the use of their damaging email evidence against them during trial.

On page 6 of 15 of their Motion in Limine, Defendants allege"[T]he emails were never produced as they would have been kept in (sic) Plaintiffs' computers—that is, in an unaltered original .pst file." As noted earlier, Plaintiff stored her

emails on an Microsoft Exchange server and not in an individual .pst file on an individual computer. If one were to believe Defendants, all of the internet evidence (including from e-discovery firms) and excerpts from a Microsoft Exchange Server book are wrong and only Defendants' version is correct. It is now apparent that this whole ESI charade has been perpetrated for the sole purpose of excluding email evidence. Defendants' lack of knowledge of the difference between *.pst format* and *.pst file format* is quite evident on page 7 of 15 where Norway notes, "[P]ut simply, Plaintiffs' refusal to produce their emails in .pst format, as twice ordered by the Court, has deprived Defendants of their opportunity to verify Plaintiffs' claims as to these emails." *.Pst format for Outlook is .msg native email format.* A .pst file format is completely different. Defendants are comparing apples with oranges. A *.pst format* of an email from Outlook is created from the application itself (an individual email is .pst format). A *.pst file* is a library of many emails. .Pst files are not supposed to be saved on individual computers when you have a Microsoft Exchange Server. The excerpts from **Exhibit 17** note why this is the case. Computer experts advise against the creation of .pst files on individual computers when Microsoft Exchange Server is used for email backup. When .pst files are created by a user who has backed up emails on a Microsoft Exchange Server, the computer automatically changes the metadata. Therefore, when Defendants asked for the same ESI in *.pst file format*

rather than in the *.pst format* in which it was initially requested and produced, the computer changed the metadata. The most metadata was preserved with Plaintiffs' initial production of the *.pst format* of Outlook with an .msg extension.

### Motion in Limine No. 3. The Court Should Not Exclude All Opinion Testimony from Lay Witnesses

As a practicing plastic and reconstructive surgeon who has specialized in skin care since January 1999, Plaintiff feels uniquely qualified to give insight into skin care products. Plaintiff has traveled throughout the United States to give talks on skin care to Walgreens' beauty advisors, but also to skin care specialists from dermatologists' and plastic surgeons' offices. Plaintiff has had the ability to personally note the confusion faced by both Walgreens' customers and Walgreens' beauty advisors when they were faced with very similar packaging of the Mineral Matters' line of products when compared with the trade dress of the DJMP skin care line of products. Plaintiff has been able to perceive the confusion that this similar packaging and trade dress infringement has caused Walgreens' customers. As an owner of several trademarks and copyrights, a television and radio personality, Plaintiff feels that she can render important testimony on the "public's perception of her name as a brand." Furthermore, Plaintiff is uniquely situated to comment on the formidable task she encountered in trying to obtain simple financial records to back up expenditures that PQM claimed it paid for. Plaintiff is

the only one who can describe the hoops that she was forced to jump through to get basic financial records and receipts, including, but not limited to ferreting through 50 to 60 boxes of receipts to find receipts to back up expenditures. Plaintiff can describe the frustration of flying half way across the country to examine records to only be told that the entire year of 2006 financial records are "not available." Plaintiff is the person who can corroborate that she was told that Walgreens purchase orders that Defendants have intentionally withheld can easily be downloaded to .pdf form and be printed out by the True Commerce software that they use.

### Motion in Limine No. 4: The Court Should Not Exclude All Evidence and Testimony of Tina Walls' Conduct and Advice

As The Honorable George J. Kelly pointed out during the March 11, 2014 hearing, there doesn't appear to be a compelling argument for the waiver of attorney client privilege.

On page 10 of 15 of Defendants' Motion, they argue that "[P]laintiffs have prevented Defendants (and the Jury) from knowing the role that    Mr. Regan's December 27, 2005 email played in the larger context of the parties' pre-contractual negotiations." In fact, Defendant Regan was quite detailed during his deposition testimony regarding the role that important email played. Note his

testimony in **Exhibit 22,** volume II, page 109 lines 7 to 19 that continues to page 110, line 2:

> "Q. Okay. Can you publish the body of the e-mail?
>
> A. Sure. It says, "Tina: I will read through this tomorrow. I have to tell you that what was discussed was a 50/50 split. I, Product Quest, would not be interested in anything else. Second, in our industry a 30 percent margin over actual chemical and labor is standard. How do you think all of the R & D, research and development, art, marketing sales staff get paid, not to mention the manufacturing personnel? I am a fair person but I feel (sic) the deal was nothing like what was discussed with Dr. Martello. We have worked with Walgreens for over 20 years and I do believe they would" –
>
> Q. Do –
>
> A. Do not believe – excuse me. You're right. Thank you.
>
> "I do not believe they would be interested either. I will discuss this with my partners tomorrow, but I am not optimistic about moving forward with this deal. The impression I get from your proposal is you are not either. I will keep you advised."

Defendant Regan explained the cost formula term used in the trade and what it meant during his deposition present in **Exhibit 22,** volume II, page 112, lines 4 to 25. If the ambiguous cost formula term used in the trade was so easy to understand, it would not have required the December 27, 2005 email to explain it:

> "A. Sometimes people mistakenly add 30 percent of their cost and add it together. But if you do the math, it doesn't work. You have to use – am I making a 30 percent margin? You have to take your price and

you're taking 30 percent of that. The way you get to that is you do a reverse calculation, which is basically your materials, your labor or whatever the components of the costs are and you divide by .7. So you're just doing reverse math to get to a, to a margin. And, and in the beginning of this contract we talked about that a lot so that we all understood it.

Q. So the discussions informed the interpretation of the contract?

A. Uh-huh.

MR. MITCHELL: Object to form.

You can answer.

Q. So the discussions informed the interpretation of the contract?

MR. MITCHELL: Object to form.

A. The, the discussions back then were very early. And it was, it was general discussions being held between Dr. Martello and myself. And where we thought we had an (start page 113 to line 5) agreement, Dr. Martello then had turned this information over to Tina, her attorney at the time, who then proposed a totally different agreement which I believe at the time had upfront fees, I believe, but I don't recall because your're talking 2005."

Regan's deposition testimony regarding the fact the impact that the email had on the interpretation of the contract continues in **Exhibit 22,** volume II, page 114, lines 8 to 12:

"A. So the discussions informed the interpretation of the contract? No, because the contract didn't, didn't exist at the time. These were, these were preliminary discussions to create the contract. And maybe I'm saying the same thing, but that's what I think you're saying.

Further Regan testimony on the same subject of the email can be found in **Exhibit 22,** volume II, page 129, lines 13 to 22:

> "Q. All right
>
> A. The e-mail you're referring to was a discussion that I was having with Tina – or an e-mail. I was responding to an e-mail and I was characterizing, you know, all the costs associated with the business. The only document that, that in my mind that we operated to was the signed Operating Agreement. This was just negotiations that were going on between Tina, Dr. Martello and myself and my partners at that time.
>
> Q. Uh-huh."

In **Exhibit 22,** volume II, page 138, lines 7 to 19 of Regan's deposition, he testified:

> "Q. Is, is it your understanding that this provision prevents Exhibit 18 from assisting in the interpretation of the agreement?
>
> MR. MITCHELL: Object to form, calls for a legal conclusion, argumentative.
>
> A. The example you're showing me once again is an e-mail. I believe this agreement – that e-mail is from December of 2005, which was part of the negotiations. This was signed a year later on January 30th of '06.
>
> Q. Uh-huh.
>
> A. So there was obviously a year of negotiations that went on, many, many changes to, you know, what we originally discussed."

Defendant Regan wildly over-exaggerates: "a year of negotiations" never took place. Rather, contract negotiation took place over three month period of time

between late November 2005 and January 30, 2006, the date the Operating and License Agreement was signed. Defendant Regan has made it crystal clear through his own testimony what impact the December 27, 2005 email had. The December 27, 2005 email was sent *contemporaneous* with contract negotiations to explain the ambiguous cost formula term used by the trade. As Regan pointed out, this cost formula term is used in the trade and "industry" and is "how every retailer in America works." (**Exhibit 22,** volume II, page 124, lines 11 to 15; page 118, lines 5 to 7).

### Motion in Limine No. 5: The Court Should Not Exclude Parole Evidence

Parole evidence should not be excluded since it is used to explain an ambiguous cost formula term used in the trade which is admissible in accordance with the "trade usage" exception. Defendant Regan's December 27, 2005 email explains the trade usage of this cost formula term by describing it as how the "industry" and "how every retailer in America works." In **Exhibit 22,** volume II, page 124, lines 11 to 15, Regan testified:

> "A. was my experience in the *industry* if you did not take at least a 30 margin (sic), you will not be able to cover the chemist that I pay, the graphic artists that did all this wonderful work, the other – the, the, the manufacturing folks. You have – all of this costs money." *(emphasis added).*

Defendant Regan further testified regarding trade usage in **Exhibit 22,** volume II, page 118, lines 5 to 7:

> "A. In the X amount of years I've been in business, that's 30 percent margin. And it's *how every retailer in America works*, by the way." *(emphasis added).*

## Motion in Limine No. 6: The Court Should Not Exclude All Evidence and Testimony of Breaches Which Purportedly Occurred Before August 23, 2007

Throughout its Motion for Summary Final Judgment and now through this Motion in Limine, Defendants attempt to argue the affirmative defense of the Statute of Limitations. Defendants had their bite at the apple when they asked for extensions and finally submitted an Answer on October 22, 2012 which listed several affirmative defenses but did not list the affirmative defense of the Statute of Limitations. Defendants moved to Amend their Pleading. This Motion was denied by The Honorable Judge Conway due to lack of showing of "good cause." According to The Federal Rules of Civil Procedure 8(c), Defendants were supposed to plead all of their affirmative defenses in their responsive pleading. A party who fails to plead an affirmative defense waives the defense. It is interesting to note that Defendants also try to plead other affirmative defenses for the first time in their Motion for Summary Final Judgment. These affirmative defenses

include the "notice of default" and the "first sale doctrine", neither of which was ever pled in their responsive pleadings.

## **CONCLUSION**

In conclusion, Plaintiff respectfully requests that The Court deny Defendants' Motion to Exclude Evidence and Testimony. Plaintiff requests oral argument on Defendants' Motion.

Respectfully submitted,

_____

Jeannette Martello, Plaintiff, In Pro Se

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct.

Executed and Respectfully Submitted,

*Jeannette Martello*
Jeannette Martello, Plaintiff, In Pro Se

# CERTIFICATE OF SERVICE

## Martello vs. Product Quest et al, Case number 6:12-cv-1304-Orl-22GJK

I hereby certify that Mr. Robert Norway and Mr. Rick Mitchell of the law firm of Gray Robinson were served electronically via the email addresses Robert.Norway@gray-robinson.com and Rick.Mitchell@gray-robinson.com with the Opposition to Defendants' Motion to Exclude Evidence and Testimony and that a copy of this document will be served on them at their offices located at:

Gray Robinson, 301 E. Pine Street, Suite 1400, P.O. Box 3068, Orlando, Florida 32801.

*Jeannette Martello*
Jeannette Martello, Plaintiff, In Pro Se
P.O. Box 914
South Pasadena, CA 91031
drmartello@gmail.com
(626) 993-8501