United States District Court

Middle District of Florida

Orlando Division

Jeannette Martello, Plaintiff

6:12-CV-1304-ORL-22-GJK

v.

Product Quest Manufacturing, LLC; et al., Defendant(s)

## PLAINTIFF'S MOTION FOR PROTECTIVE ORDER

In accordance with Federal Rule of Civil Procedure 26(c), Plaintiff is respectfully filing this

Motion for Protective Order asking The Honorable Court to forbid the disclosure or discovery of

Plaintiff's federal and state tax returns. Good cause exists for The Court to issue an Order to protect

Plaintiff from annoyance, embarrassment, oppression or undue burden or expense. In accordance with

Federal Rule of Civil Procedure 26.2(a), Plaintiff Moves for a Stay of Discovery at which this Motion is

directed pending an Order from The Honorable Court on this Motion for Protective Order. Plaintiff has

previously submitted a Rule 72 Objection to The Honorable Magistrate Judge Gregory J. Kelly's Order

dated March 18, 2014. **Exhibit 1.** Plaintiff would like to incorporate through reference the Rule 72

Objection that was previously filed on April 4, 2014 and that appears as Doc.130.

## STANDARD OF REVIEW

Plaintiff respectfully incorporates by reference the governing standard as set forth in Federal

Rules of Civil Procedure 26(b)(1), 26(c), Rule 26.2(a), Rule 8(c), Rule 72 and Florida Rules of Civil

Procedure 1.280(b)(1). Federal Rule of Civil Procedure 26(c)(1)(A) reads:

"(c) Protective Orders.

(1) In General. A party or any person from whom discovery is sought may move for a protective order in the court where the action is pending—or as an alternative on matters relating to a deposition, in the court for the district where the deposition will be taken. The motion must include a certification that the movant has in good faith conferred or attempted to confer with other affected parties in an effort to resolve the dispute without court action. The court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including one or more of the following:

(A) forbidding the disclosure or discovery"

"Good cause" exists since there is a sound basis and legitimate need for The Honorable Court to take judicial action. Plaintiff meets the four factors for proving that "good cause" exists: "[1] the severity and the likelihood of the perceived harm; [2] the precision with which the order is drawn; [3] the availability of a less onerous alternative; and [4] the duration of the order." *Kleiner v. First National Bank of Atlanta*, 751 F.2d 1193, 1205 (11th Circ. 1985). Balancing the interests between the Plaintiff and the Defendants, good cause exists for issuing this Motion for Protective Order and denying Defendants access to Plaintiff Martello's (hereinafter "Martello") federal and state tax returns for the years 2007, 2008, 2009, 2010, 2011 and 2012.

Florida case law exists on the compelled production of tax returns during discovery. Most of the cases in which Courts have compelled the production of tax returns involve Defendants. Only a small percentage of cases involve Plaintiffs. The cases in which tax returns were compelled by the Court are listed below. In these cases, Plaintiffs were compelled to produce their tax returns when they placed their income at issue. Plaintiff has not placed her income at issue in the claims that she alleges in her Complaint. Defendants have had to produce their tax returns and financial records in cases which involved punitive damages and trademark infringement, both of these claims were pled in Plaintiff's Complaint.

## Plaintiffs Compelled to Produce Tax Returns

--*Camp v. Correctional Medical Services*, No. 2:08-cv-227-WKW (WO), (M.D. Ala. Feb. 17, 2009). Defendants' Motion to Compel Plaintiff's tax returns denied. "The relevancy of the plaintiff's

income tax returns to their claims for damages is tenuous at best." Defendants argued that "it needs the income tax returns to confirm the "full picture" of the plaintiff's income. This argument is pure speculation and conjecture by the defendant."

--*Popov v. George & Sons Towing*, No. 2:12-cv-00123-SPC-UAM, (M.D. Fla. March 6, 2012 ). Motion to Compel production of Plaintiff's tax returns denied as not relevant. Defendant argued that the tax returns "could be used to impeach the Plaintiff's credibility at trial." The Court found that "his tax returns are simply not relevant to the issues in this case."

--*Maddow v. Procter & Gamble Co., Inc.*, No. 95-9576, 107 F.3d 846, United States Court of Appeals 11th Circuit, 1997. United States Court of Appeals for the Eleventh Circuit found that "plaintiffs were substantially justified in initially refusing discovery." Court found that plaintiffs were compelled to produce their tax returns in this case that involved age discrimination and in which lost earnings and income was placed directly at issue.

## Defendants Compelled to Produce Tax Returns

--*Capco Properties, LLC., et al. v. Monterey Gardens of Pinecrest Condominium, et al.*, No. 3D08-1127, Lower Tribunal No. 06-5685, (Fla. 3d DCA 2008). In this case, Defendants were not compelled to produce their tax returns to prove financial worth since neither accounting nor punitive damages had not been pled in the Complaint.

--*Coach, Inc. v. Swap Shop, Inc.*, No. 12-60400-CIV, 2013 WL 4407064, (S.D. Fla. Aug. 13, 2013). Defendants' tax returns compelled to be produced in a case which involved trademark infringement, unfair trade practices, copyright infringement and damages for sales income derived from the Defendants' sale of infringing products.

-- *Dunkin' Donuts, Inc. v. Mary's Donuts, Inc.*, No. 01-0392-CIV, 2001 WL 34079319, (S.D. Fla. Nov. 1, 2001). Defendants' tax returns were compelled to be produced for Plaintiff's case which involved

alleged breaches of franchise agreements; trademark infringement; trade dress infringement; unfair competition; underreported income; underpaid franchise fees; failure to maintain proper financial documentation for inspection as required by the franchise agreement; operation of an unlicensed donut shop and failure to cease operations of the donut shops once Plaintiffs terminated the franchise agreements.

--*Woodward v. Berkery*, 714 So.2d 1027, Nos. 97-0398, 96-2483, (Fla. 4th DCA 1998). The Court decided that celebrity Tom Jones' tax returns did not need to be produced based on his fundamental right of privacy in this child support modification case.

-- *United Subcontractors, Inc. v. Darsey, Jim Romeka, Construction Solutions & Supply, LLC,* No. 3:13-cv-603-J-32MCR,(M.D. Fla. Jan. 8, 2014). The Court compelled production of defendant Romeka's tax returns.

--*United States of America v. Real Property,* No. 04-81135CIV, 444 F.Supp.2d 1258 (S.D. Fla. April 5, 2006). Defendants' tax returns were found relevant based on his claims that he was the "innocent owner of the money owed to him" under a contract. Plaintiff United States of America was suing on an action involving the forfeiture of real property based upon stock fraud.

--*UnitedHealth Group, Inc. v. Dowdy*, 8:06-cv-02111-SDM-EAJ, (M.D. Fla. Nov. 9, 2006). Defendants' tax returns were ordered to be produced in this case that involved ERISA subrogation from Defendant's third party settlement for accidental injuries.

--*Equal Employment Opportunity Commission v. Dimare Ruskin, Inc.*, No. 2:11-CV-158-FTM-36SPC, (M.D. Fla. Aug. 23, 2011). Defendants' tax returns were found relevant and were to be produced in a claim in which punitive damages were pled and in which Defendants' financial worth was important.

-- *Regions Bank v. MDG Frank Helmerich*, LLC No. 2D12-2427, 118 So.3d 968, (Fla. 2d DCA, 2013). Post judgment debtor tax returns were ordered to be produced on a deficiency judgment.

-- *Rocket Group, LLC v. JATIB*, No. 4D13-134, (Fla. 4th DCA 2013). Defendants' tax returns ordered to be produced with a confidentiality order.

-- *Soliday v. 7-Eleven, Inc.* No. 2:09-cv-807-FtM-29SPC, 2010 WL 3928586 (M.D. Fla. Oct. 4, 2010). Defendants' tax returns ordered to be produced in a case involving punitive damages and intentional civil rights employment discrimination.

-- *New Hampshire Indemnity Co., Inc. v. Reid*, 3:05-CV-1280-J-12MCR, (M.D. Fla. July 27, 2006). Defendants' tax returns compelled due to their relevance in proving whether or not Defendant's son was a "family member" or a dependent for the automobile policy involving a fatal car accident.

--*Eberhardt v. Eberhardt*, No. 95-3986, 666 So.2d 1024, (Fla. 4th DCA 1996) *Certiorari* denied for this case which involved the compelling of the production of tax returns from Defendants in a case which involved claims for accounting, fraud, breach of contract, constructive trusts and rescission of a deed.

--*Shipboard Electrical v. Newcastle*, No. 3:11-cv-582-J-32MCR, (M.D. Fla. Sept. 7, 2012). Plaintiff's Motion to Compel production of Defendants' tax returns denied. "Plaintiff's stated reason for requested discovery is to show that Defendant lacked funds to pay Plaintiff "due to mismanagement or improper budgeting." The *Shipboard* Court found that the "rationale is not sufficient to support the requests for financial documents because it bears no relevance to the claims at issue."

## STATEMENT OF FACTS

Plaintiffs signed an Operating Agreement and License Agreement on January 30, 2006 to sell skin care products to Walgreens through a Company called Dr. Jeannette Martello Products, LLC (hereinafter "DJMP"). **Exhibit 2.** DJMP exclusively sold skin care products to Walgreens between the years 2006 and 2008. DJMP was administratively dissolved in 2012. Plaintiffs filed their complaint on August 24,

2012. **Exhibit 3.** Defendants filed their Answer on October 22, 2012. **Exhibit 4.** Plaintiff Martello's

(hereinafter "Martello") deposition was taken on November 26, 2013. **Exhibit 5.** Defendants filed an

Opposed Motion to Amend Affirmative Defenses on December 16, 2013. **Exhibit 6.** This Motion was

denied by The Honorable Judge Anne C. Conway on January 6, 2014. On January 20, 2014, Plaintiffs

filed a Motion to Compel the production of "any and all receipts, invoices, purchase orders, spreadsheets,

accounts, books, balance sheets, income statements, annual accountings and financial statements" for

Product Quest, Inc. and Product Quest, LLC. Annual accountings included the request for tax returns

since they are filed on an annual basis. **Exhibit 7.** On the same day, Defendants filed their Third Motion

to Compel which included a production demand for Plaintiffs' tax returns. **Exhibit 8.** Defendants filed a

Response in Opposition to Plaintiff's Motion to Compel on February 6, 2014. **Exhibit 9.** Defendants

filed a Motion for Summary Final Judgment on February 14, 2014 in which new affirmative defenses of

the Statute of Limitations, "notice of default" and "first sale" were pled for the first time. **Exhibit 10.** A

March 11, 2014 hearing was held in front of The Honorable Judge Gregory J. Kelly during which several

Discovery Motions were heard. **Exhibit 11.** The Honorable Judge Gregory J. Kelly denied Plaintiff's

Motion to Compel the production of Defendants' financial records. The Honorable Judge Gregory J.

Kelly did order the production of Walgreen's *written* vendor agreement. Defendants had previously pled

in their Answer on page 7 of 16 that "an oral or implied vendor agreement" existed with Walgreens

Company. The Honorable Judge Gregory J. Kelly ordered that Plaintiff produce her Federal and state tax

returns in response to Defendants' Third Motion to Compel.

## LIMITATIONS ON THE SCOPE OF DISCOVERY

Document requests must be reasonably calculated to lead to the discovery of admissible evidence

and overbroad requests are not permitted. *R.M.R. ex rel. P.A.L. Muscogee County Sch. Dist.*, 165 F. 2d

812, 816-17 (11th Cir. 1999). The Federal Discovery Rules do not permit a party to go on a "fishing

alone and free from governmental intrusion into the person's private life except as otherwise provided herein. This section shall not be construed to limit the public's right of access to public records and meetings as provided by law."

The importance of protecting a party's privacy interest was stressed by The Florida Supreme Court:

"[W]e do not ignore petitioner's valid privacy interest in avoiding unnecessary disclosure of matters of a personal nature. We believe, however, that our discovery rules provide sufficient means to limit the use and dissemination of discoverable information via protective orders." *Martin-Johnson, Inc. v. Savage*, 509 So.2d 1097, 1099 (Fla. 1987).

The *Woodward* Court noted that "personal finances are among those private matters kept secret by most people. *Woodward supra* citing *Winfield v. Division of pari-Mutuel Wagering*, 477 So.2d 544 (Fla. 1985). The disclosure of financial records is "made only so far as necessary." *Woodward supra* at 1036. In the *Woodward* case which involved child support modification, The Court did not require the disclosure of Defendant Tom Jones' tax returns to fortify Plaintiff's claims that she was entitled to more child support due to the celebrity's resurgence of her career.

The general rule in Florida is that personal financial information is ordinarily discoverable only in aid of execution after judgment. *Friedman v. Heart Inst. Of Port St. Lucie, Inc.,* 863 So.2d189, 194 (Fla. 2003); *Gruman v. Bankers Trust Co.,* 379 So.2d 658, 659 (Fla. 3d DCA 1980). In fact, Congress declared that private tax returns are to be kept confidential in Title 26, Chapter 1, Section 6103:

"Section 6103 provides that *returns and return information shall be confidential* and may not be disclosed except as authorized by the Code. The term "return information" includes any information received or prepared by Service employees with respect to a return or with respect to the determination of the existence or possible existence of liability of any person for any tax, penalty, or interest. The term also includes any part of a written determination or related background file document that has been redacted in accordance with section 6110(c) or (i). Return information also includes advanced pricing agreements and closing and similar agreements. See section 6103(b)(2)(C) and (D)."

Like all other discovery, the question of discoverability of tax records turns on relevance. *Shearson Lehman Hutton, Inc. v. Lambros,* 135 F.R.D. 195, 198 (M.D. Fla. 1990). Litigants should not be required to produce income tax returns "as the price for bringing or defending a lawsuit" where the returns are not relevant. *Camp v. Correctional Medical Services supra* quoting *Ex parte Morris,* 530

So.2d 785, 788 (Ala. 1988).

One of the cases that is most on point in this matter is that of *Capco Properties, LLC., et al. v. Monterey Gardens of Pinecrest Condominium, et al.,* No. 3D08-1127, Lower Tribunal No. 06-5685, (Fla. 3d DCA 2008). The Court held that defendants were not compelled to produce their tax returns to prove financial *worth since a claim for punitive damages had not been pled*. The *Capco* Court opined, "[A]re appellate judges obliged to sit on their hands when totally irrelevant material encompassing six years of *extensive and intrusive financial information* is ordered to be produced *where the plaintiff has not even pled a count for accounting nor moved to amend to assert punitive damages?" (emphasis added).* Plaintiff pled accounting and punitive damages in her Complaint, but was denied access to Defendants' financial records through her Motion to Compel. Defendants' request for Plaintiff's tax returns amount to nothing more than a "fishing expedition" and giving them *carte blanche* to obtain extensive, intrusive and private financial information that is not related to any claim or defense pled.

## LEGAL ARGUMENT

"Good cause" exists since plaintiff has a privacy right to her confidential financial information and therefore the severity and likelihood of the perceived harm exists. The March 18, 2014 Motion to Compel Order was drawn without precision in that it compelled the production of tax returns for the years 2007, 2008, 2009, 2010, 2011 and 2012. These tax returns are not relevant to the claims or defenses pled. The Order to Compel Plaintiff's tax returns was made contrary to Eleventh Circuit and Florida precedent. An availability of a less onerous alternative exists and was taken advantage of by Defendants who acquired the information from Plaintiff's own deposition testimony. The duration of the Order appears to exist indefinitely. Furthermore, Plaintiff was not given the opportunity to provide her private, financial information *in camera* for The Honorable Judge Gregory J. Kelly to decide whether or not any of the tax returns contained relevant information. Also, no confidentiality order or protective

order was issued to protect Plaintiff's financial information that was compelled to be provided. When a balancing of interests test is applied, it is apparent that Plaintiff will be irreparably harm by being forced to provide irrelevant, intrusive, private and confidential tax returns that span a total of six years. For the reasons noted below, Plaintiff Martello respectfully prays for a Protective Order in accordance with Federal Rule of Civil Procedure 26(c)(1)(A) forbidding the disclosure or discovery of her tax returns so as to be in accordance with the law.

### Defendants' "Relevance" Allegation Number One:

In their Third Motion to Compel, Defendants argue why Martello's tax records are relevant:

> "Martello's tax records are relevant in that they contain information relating to Plaintiffs' *claimed damages or which will lead to the discovery of such information.* Martello's tax returns will contain information concerning the sources of her income, including income from her name and likeness or lack thereof. Thus, the returns are *relevant to the damages sought by Martello in her claims for misappropriation of her name and trademark infringement.*" *(emphasis added).*

Plaintiff's tax returns have no relevance to any of the defenses pled by Defendants in their Answer that are required by the scope of discovery limitations enunciated in Federal Rule of Civil Procedure 26(b)(1) and Florida Rule of Civil Procedure 1.280(b)(1). On page 9 of 16 of their Answer Defendants pled a general denial to Plaintiff's misappropriation claim. With respect to Plaintiff's claims of trademark infringement, Defendants also pled a general denial on page 9 of 16. **Exhibit 4.**

Defendants claim that Martello's tax records are relevant in that they "will contain information concerning the sources of her income, including income from her name or likeness or lack thereof." Martello did not plead personal loss of income or plead any element with respect to her income nor did Martello plead any loss of future earnings. A search of the entire Complaint filed on August 24, 2012 reveals that the only time that the word "income" appears is on page 4, under Count I – Breach of Contract by Quest, Inc. and Quest LLC – Accounting, paragraph 23, where Plaintiff refers to income statements:

"23. Pursuant to Article VI, Section 6.5 and Article XIV, Section 14.2 of the Operating Agreement, The Company's accounts, books, and records were to be kept at its principal place of business and provided to its members with bi-monthly balance sheets and *income* statements and annual accountings and financial statements."

A review of Defendants' Answer reveals that the word "income" does not appear anywhere on the document. **Exhibit 4.**

Therefore, Defendants' "relevance" allegation number one is not relevant to any claim or defense pled. *Capco supra.* Martello's tax returns should not be compelled to be produced.

**Defendants' "Relevance" Allegation Number Two:**

In paragraph two of page 4 of Defendants' Third Motion to Compel, Defendants allege:

"Martello's tax records are also relevant in that they contain information that can be used to show Martello's acceptance of, and reliance on, the financial disclosures of Dr. Jeannette Martello Products, LLC. Such records can be used to show, for instance, *Martello knowingly and willingly accepted tax benefits for the years in which Dr. Jeannette Martello Products, LLC reported operating losses or wrote off inventory." (emphasis added).*

Defendants note that "2007 was the only year in which DJMP made a net profit." **(Exhibit 10,** page 3). Defendants declared that "DJMP wrote off its remaining inventory of specialized product components in 2010, and wrote off its remaining finished goods inventory as unsalable in 2011." **(Exhibit 10,** page 4). Therefore, DJMP had an "operating loss" in years 2008, 2009, 2010, 2011 and 2012 and inventory write offs occurred in the years 2010 and 2011. Throughout their own argument regarding the "relevance" of Martello's tax returns, Defendants have already admitted that there is no need for Plaintiffs' tax returns for 2007 since there was no operating loss or write off of inventory in that year.

Let's look at Martello's deposition with respect to the questions regarding tax returns for the years 2008, 2009, 2010, 2011 and 2012. Since JYM, LLC is a "single member entity", pass through of tax benefits would pass unto Martello's personal income tax returns:

**Year 2008:** **Exhibit 5,** Doc. 53-2, page 30 of 42, page 242, lines 15 to 25:

"Q. At the top it says Part III. Do you see the ordinary business income loss of negative $ 20,041?

A. Yes.

Q. So did you report that loss on your personal tax return for 2008?

A. That is my understanding from my accountant.

Q. And did you, did you or JYM, LLC send a section 8 Notice of Default to Product Quest based upon the Schedule K-1 issued to JYM, LLC for 2008?

A. No."

**Year 2009:** **Exhibit 5,** Doc. 53-2, page 34 of 42, page 261, lines 22 through 25 and then continues onto

page 262, lines 1 to 12:

"Q. Defendants' 53, this is the Form 1065 U.S. Return of Partnership for DJMP for 2009 – wait. Yeah. Let me direct you to the K-1. That's second from the back.

A. Yes.

Q. Is that a true and correct copy of the K-1 issued to the partner named JYM, LLC for 2009?

A. Yes. It's at my personal and business address.

Q. And the amount of ordinary business income loss in the top right?

A. Negative 4299.

Q. Did you take that income loss as a deduction on your personal tax return for 2009?

A. I am sure my accountant did that.

Q. Okay. Did you or JYM send a section 8 Notice of Default to Product Quest based upon the 2009 K-1 issued to JYM, LLC?

A. No."

**Year 2010:** **Exhibit 5,** Doc. 53-2, page 39 of 42, page 278, lines 9 through 12:

"Q. Okay. And did you claim – did you take that ordinary business income loss of 97,973 on your personal income tax form for the year 2010?

A. Yes."

**Exhibit 5,** Doc. 53-2, beginning on page 265, lines 21 to 25 and continuing onto page 266, lines 1 to 4 of page 36 of 42:

"Q. Okay. This is a – is this a true and correct copy of the 2010 K-1 issued by DJMP to JYM, LLC?

A. Looks like it, uh-huh.

Q. And the ordinary income, ordinary business income loss, how much?

A. Negative 97,973.

Q. And did you report that loss on your personal tax return for the 2010 year?

A. I'm sure my accountant did."

Defendants' questioning continued on **Exhibit 5, Doc. 53-2,** page 266, lines 5 through 10 on page 36 of 42:

"Q. Okay. And did you do a section 8 – you or GYM (sic) do a section 8 Notice of Default to Product Quest based upon the 2010 K-1 at Defendants' 56?

A. No."

<u>Year 2011:</u> **Exhibit 5,** Doc. 53-2, page 39 of 42, page 278, line 25 with continuation onto page 279, lines 1 to 10:

"Q. Please find attached your 2011 K-1?

A. This thing looks like it's cut and pasted. It doesn't look anything like –

Q. Well, it's printed in a –

A. Weird.

Q. It's printed in a format.

A. It looks like it's cut and pasted.

Q. My question is do you remember – does this refresh your recollection that Mr. Jennings sent you a copy of the 2011 K-1?

A. No, it does not."

The reason why Martello does not remember being provided with a K-1 for 2011 is because she was not provided with one by Defendants. This fact is documented by one of the last email exchanges with Product Quest's Chief Financial Officer Bill Jennings. **Exhibit 12.**

Defendants argue that Martello's federal and state tax returns to prove that she accepted tax benefits in the years that there were operating losses. Defendants received this very same information from Martello during her deposition when she readily admitted that she derived tax write offs during the years of 2008, 2009 and 2010. Therefore, Defendants do not have a "compelling need" for Martello's tax returns since they already obtained this information through her deposition testimony. As previously noted, Martello never received a K-1 for the years 2011 or 2012. The K-1's for the years 2011 and 2012 were first discovered during this litigation.

In each area listed above regarding questions on tax returns, Martello was asked whether she sent a Section 8 Notice of Default. It appears that the "notice of default" affirmative defense is the reason for Defendants' request for Martello's tax returns. Defendants appear to rely on a "notice of default" affirmative defense during Martello's deposition. In fact, the words "notice of default" appeared no less than 28 times throughout the deposition. Defendants never pled a "notice of default" affirmative defense in their Answer. In fact, when Defendants filed a Motion to Amend on December 16, 2013 (nearly a month after conducting Martello's initial deposition on November 26, 2013), they never asked for leave to assert the additional affirmative defense of "notice of default". This "notice of default" affirmative defense was pled for the first time with the affirmative defense of "first sale" in Defendants' Motion for Summary Final Judgment filed with The Court on February 14, 2014. **Exhibit 10.**

According to The Federal Rules of Civil Procedure Rule 8(c), all affirmative defenses need to be pled in the responsive pleading. If an affirmative defense is not pled, it is waived. In the Eleventh Circuit and in Florida, a "notice of default" defense is an affirmative defense. *Century 21 Real Estate LLC v. Perfect Gulf Properties, Inc.*, No. 6:08-cv-1890-Orl-28KRS (M.D. Fla. Feb. 17, 2010); *In Re Villamont-Oxford Associates Ltd.*, Bankruptcy No. 97-9832-8G1, 230 B.R. 445, (M.D. Fla. April 17, 1998); *In Re*

*Venice-Oxford Associates Ltd. Partnership*, Bankruptcy No. 97-9831-8G1, 236 B.R. 791, (M.D. Fla. April 17, 1998); *Auto-Owners Ins. V. Tomberlin, Young & Folmar Ins.*, No. 2:11-cv-468-WHA (M.D. Ala. July 24, 2012), 880 F.Supp.2d 1236; *Krauser v. Biohorizons, Inc.*, No. 10-80454-CIV-MARRA (S.D. Fla. Sept. 1, 2010); *Aerojet-General Corporation v. Kirk*, No. Civ. A. No. 1534 (N.D. Fla. Sept. 21, 1970), 318 F.Supp. 55; *Bickerstaff v. US Bank National Association*, No. 1D13-3115 (Fla. 1st DCA 2014); *Seale v. Regions Bank*, No. 4D12-3869, 121 So.3d 649, (Fla. 4th DCA 2013); *DiSalvo v. Suntrust Mortgage, Inc.*, No. 2D11-2707, 115 So.3d 438, (Fla. 2d DCA 2013); *Kurian v. Wells Fargo Bank, Nat. Ass'n*, No. 4D11-3098, 114 So.3d 1052, (Fla. 4th DCA 2013); *Judy v. MSMC Venture, LLC*, No. 2D11-1896, 100 So.3d 1287, (Fla. 2d DCA 2012); *Congress Park Off. V. First-Citizens Bank*, No. 4D11-4479, 105 So.3d 602, (Fla. 4th DCA 2013); *Cerron v. GMAC Mortgage, LLC*, No. 2D11-3425, 93 So.3d 456, (Fla. 2d DCA 2012); *Boye v. Citimortgage, Inc.*, No. 2D11-2604, (Fla. 2d DCA 2012); *Godshalk v. Countrywide Home Loans*, No. 5D10-2376, 81 So.3d 626, (Fla. 5th DCA 2012); *Bryson v. Branch Banking and Trust Co.*, No. 2D10-3360, 75 So.3d 783, (Fla. 2d DCA 2011); *Babe's Plumbing, Inc. v. Maier*, No. 6678, 194 So.2d 666, (Fla. 2d DCA 1966)

Martello's tax returns are not relevant to the issues of this case as required by Federal Rule of Civil Procedure 26(b)(1) and Florida Rule of Civil Procedure 1.280(b)(1). Martello never placed her income at issue in the case and 2) Defendants never pled the "notice of default" affirmative defense in its responsive pleading. Since the threshold need of relevance is not met in this case, Martello's tax returns should not be compelled to be produced.

## Defendants' "Compelling Need" Allegation Number One

A. In their Third Motion to Compel, Defendants argue why there is a "compelling need" for Martello's tax returns:

> "There is also a compelling need for such tax records *because Plaintiffs have failed to produce a single agreement, license, or assignment concerning*

> *the licensing of Dr. Martello's name and likeness, despite the existence of a special purpose entity intended to be used by Martello as the nominal owner of her intellectual property assets.* Such documents have been the subject of several of Defendants' requests for production. The failure to produce licenses and agreements suggests that *Martello did not value her name and likeness in the same manner as her other intellectual property assets." (emphasis added).*

Defendants argue that a "compelling need" exists for Martello's tax returns to prove a negative, that is, the *non-existence* of an "agreement, license or assignment concerning the licensing of Dr. Martello's name and likeness." Defendants argue further "[t]he failure to produce licenses and agreements suggests that Martello did not value her name and likeness in the same manner as her other intellectual property assets." How Plaintiff Martello valued her name and likeness has nothing to do with any single defense that was pled by Defendants in their Answer. Based on Federal precedent, whether or not a person licenses her name or likeness is irrelevant.

The Operating Agreement reads:

> "[U]pon the execution of this Operating Agreement, Members will provide services, technical and business expertise, trade relationships, and goodwill; including, the grant of a license is embodied in a "License Agreement" attached hereto as Exhibit C signed in conjunction with this Operating Agreement and made a part hereof."

The License Agreement became a part of the Operating Agreement to comprise a single contract. In paragraph one, page one of the License Agreement **(Exhibit 2)**, the term "Celebrity" was defined as Dr. Jeannette Martello individually and on behalf of JYM, LLC. A license was granted to the Company DJMP for "the right to use Celebrity's goodwill, likeness, image, name or derivations thereof, and voice in print, photography, recordings, video or visual works, advertising, and point-of-purchase materials all if which shall be done only in connection with the marketing and endorsement of the Products of the Company." "Celebrity shall not allow her name to be incorporated into the name of a product in competition with Company's products" **(Exhibit 2**page two, paragraph number 4).

## Plaintiff's Right of Publicity

Many courts have recognized, as a property right, a person's use of his or her name and likeness. *Haelan Laboratories v. Topps Chewing Gum,* 202 F.2d 866 (2d Cir.), *cert. denied,* 346 U. S. 816, 74 S.Ct. 26, 98 L.Ed. 343 (1953); *Ettore v. Philco Television Broadcasting Corp.,* 229 F.2d 481 (3d Cir. 1956); *Uhlaender v. Henricksen,* 316 F.Supp. 1277 (D.Minn.1970). *See also Grant v. Esquire, Inc.,* 367 F.Supp. 876 (S.D.N. Y.1973). The commercial value of such a right stems from a person's ability to control its use. *Price v. Hal Roach Studios, Inc.,* 400 F. Supp. 836, 843 (S.D.N.Y. 1975).

The importance of an individual's given name was emphasized by The United States District Court for the Central District of California in *Abdul-Jabbar v. General Motors Corporation,* No. 94-55597, 85 F.3d 407 (1996). Defendant General Motors contended that Kareem Abdul-Jabbar abandoned his birth name of Lew Alcindor. According to The Court, "the abandonment defense has never to our knowledge been applied to a person's name or identity." The Court found in plaintiff Abdul-Jabbar's favor on his Lanham Act claim:

> "an individual's given name, unlike a trademark, has a life and
> a significance quite apart from the commercial realm. Use or
> nonuse of the name for commercial purposes does not dispel that
> significance. An individual's decision to use a name other than
> the birth name –Whether the decision rests on religious, marital,
> or other personal considerations – does not therefore imply intent
> to set aside the birth name, or the identity associated with that name."
> *Abdul-Jabbar supra* at 412.

The *Abdul-Jabbar* Court explained the connection between the right to publicity to the right to privacy:

> "The so-called right of publicity means in essence that the reaction
> of the public to name and likeness, which may be fortuitous or which
> may be managed and planned, endows the name and likeness of the person
> involved with commercially exploitable opportunities. The protection of
> name and likeness from unwarranted intrusion or exploitation is the heart
> of the law of privacy." *Abdul-Jabbar supra* at 413.

## The Right to Not Use The Right of Publicity

Abdul-Jabbar argued that "abandonment cannot be a defense to appropriation because the right of publicity protects not only a celebrity's "sole right to exploit" his identity, White, 971 F.2d at 1399, but also *his decision not to use his name or identity for commercial purposes.* See, e.g. Waits, 978 F.2d 1093 (applying right of publicity protection to singer with moral and aesthetic objections to advertising). We agree." In its Opinion, the *Abdul-Jabbar* Court cited the precedential Federal Court cases of *Price v. Hal Roach Studios, Inc.,* 400 F. Supp.836, 846 (S.D.N.Y. 1975) and *Grant v. Esquire,*367 F.Supp. 876, 880 (S.D.N.Y. 1973) which are discussed below.

The *Price* case dealt with the property rights of the names and likenesses of Laurel and Hardy. The Federal District Court noted in this precedential decision that:

> "It cannot be possible for Laurel and hardy to lose rights in their own names and likenesses through *"non-use."* **If a person chooses not to exercise the right or publicity**, there is the attendant statutory right of privacy in New York which protects that person from commercial exploitation by others. **There cannot, therefore, be any necessity to exercise the right of publicity during one's life in order to protect it from use by others or to preserve any potential right of one's heirs."** *Price supra* at 846. *(emphasis added).*

The *Price* Court stressed that "plaintiffs' non-use of commercial value of name and likeness does not preclude against others." *Price quoting Grant v. Esquire, Inc.,* 367 F.Supp. 876, 880 (S.D.N.Y. 1973).

The very issue of the value of a "name or likeness" and whether or not a person has taken advantage of his commercial value of his name or likeness has been addressed by The Federal Courts in another precedential decision. In the *Grant* case, Cary Grant sued Esquire for the unauthorized use of his photograph. Plaintiff Grant asserted that he did "not want anyone himself included to profit by the publicity value of this name and reputation." *Grant supra* at 880. The *Grant* decision stands "for the proposition that nonuse of commercial value of name and likeness does not preclude against violation by others." The *Grant* Court declared:

> "The question then arises whether the rights of plaintiff Grant because of his renunciation of any desire to exploit the commercial value of his own name and fame should be any different than those of Twiggy. We

think not.  If the owner of Blackacre decides for reasons of his own not to use his land but to keep it in reserve he is not precluded from prosecuting trespassers."  *Grant supra* at 880.

B.  Defendants argue in footnote 3 of their Third Motion to Compel:

"According to the emails and documents produced in this action, Martello maintains, or at one time maintained, several Nevada entities through which she conducted business. JYM was one of these entities. ***An entity called Jackson Hole, LLC was created by Martello "for intellectual property***."  Martello has resisted all Defendants' efforts to discover the identity of these entities, their relationships, and any inter-entity ***transactions that would bear on the issues in this action, such as damages."***

This argument does not strengthen their request for Martello's production of tax returns.  Martello has patents on surgical instruments in both the United States and in foreign countries.  What relevance does her other "intellectual property" have to the case at hand?  The answer is nothing.

If the information was so important for Defendants to discover, why did they not ask Martello a single question about the "identity of these entities, their relationships, and any inter-entity transactions"?  A search for the words "entity" or "entities" throughout the three volumes of Martello's deposition taken on November 26, 2013 reveal that no questions were asked of Martello regarding these "issues".  Martello's deposition was continued on January 31, 2014 (in violation of The Court's order to continue it).  During this continued deposition, Martello was not asked a single question regarding "these entities, their relationships, and any inter-entity transactions."  Martello was not asked a single question regarding her other "intellectual property" besides the trademarks that she owns.  The reason for this is that these issues are irrelevant to the case and have no bearing on any defense pled by Defendants in their general denial answer filed with The Honorable Court on October 22, 2012.

C. Defendants argue that there is a "compelling need" for Martello's tax records because:

"Dr. Martello also failed to articulate the basis for Plaintiffs' alleged damages (for both her federal trademark claim and her state law contract and tort claims) when deposed in this action.  Thus, Defendants' have not been able to obtain this information though (sic) their other discovery efforts."

During her deposition, Martello was questioned several times regarding damages. Each time she was asked , her attorney objected for a variety of reasons. **Exhibit 5,** page 304, page 5 of 33 of Doc. 53-3, lines 10 through 25:

> "Q. How has JYM been damaged by a failure to timely deliver records?
>
> MR. SOBODASH: *Well, it calls for a legal conclusion*, but answer to the extent you understand.
>
> A. If I had been provided the records that showed what I learned in the audit trail, for example, I would have found that the bills totaling $ 3.1 million were generated and put into QuickBooks for the first item in 2012. That definitely would have put me on notice that something awry was happening.
> If I had seen the invoices being charged for UPS, shipping and handling
> From China for 30,000 travel bags for Men's Zones (sic), I would have been put on notice something awry was happening. If I would have seen the breakdown of the invoices that were supplied to Walgreens for $ 21,000 and JY - -- Jeannette Martello's products being paid $ 200 on that very same invoice, I would have seen that the company had been short-changed over $ 20,000."

Another objection is noted at **Exhibit 5,** page 328, page 11 of 33 of Doc. 53-3, lines 3 through 9:

> "Q. Okay. Paragraph 43, you say, Plaintiffs have sustained and continue to sustain monetary damages. How?
>
> A. I talked about that earlier.
>
> MR. SOBODASH: *Calls for a legal conclusion, narrative.* Ask to the extent – answer to the extent you can. *I believe it's an incomplete question.*

Another objection is noted on **Exhibit 5,** page 329, page 11 of 33 of Doc. 53-3, lines 5 to 12:

> MR. SOBODASH: Jeannette, do you – I mean, the problem with your
> Questions, Counsel, I have to say respectfully, you're asking *very open-ended questions, you're calling for a narrative*, and then you're saying, well, you can't point to thousands of pages of documents.
> So I don't quite know that it's proper for you to object to her testimony."

The *Grant* Court declared that "[U]nder Rule 8, a pleading must contain a short and plain statement of the claim showing that the pleader is entitled to relief. It is not necessary to set out the legal theory on which the claim is based." *Grant supra* at 885.

It has now become abundantly clear that Plaintiff can't adequately ascertain a damages number for several reasons that were not apparent during Martello's deposition. Some of these reasons include:

1) Defendants have failed to produce a single Walgreens purchase order so that gross sales income for DJMP skin care products can be ascertained; 2) Defendants have interfered with a Rule 45 third party subpoena that was served on Walgreens and skeletonized the 2500 pages of records down to 119 pages, 13 pages of which were redacted; 3) Defendants have failed to turn over a single purchase order from their True Commerce electronic data interchange software that the company notes can be saved in PDF format and printed; 4) Defendants have withheld all financial records and vendor files for the entire year of 2006 in which over $ 1,294,690.71 was "expended" on behalf of the joint venture DJMP; 5) Defendants have overcharged Plaintiff for the labor performed by LF of America for the "blend and fill" of Daily Measures for the *same* batches of chemicals during the *same* time period. Defendants' own expert Mr. O'Toole notes that the Operating Agreement does not allow for the DJMP skin care products to be manufactured or filled by a third party; 6) Defendants grossly overcharged Plaintiff for components such as ampules. Defendants were charged 5 cents per ampule and turned around and charged Plaintiff 83 cents per ampule.

The questions asked of Martello called for legal conclusions. Furthermore, Martello was at a disadvantage to answer questions regarding damages due to the inadequate financial information that was provided to her by Defendants. Defendants should not be able to argue that a "compelling need" exists for Martello's tax returns when this private financial information is not relevant to their defenses. Furthermore, Eleventh Circuit precedent dictates that a plaintiff should not be required to produce its income tax returns to prove damages. Litigants should not be required to produce income tax returns "as the price for bringing or defending a lawsuit" where the returns are not relevant. *Camp v. Correctional Medical Services supra* quoting *Ex parte Morris,* 530 So.2d 785, 788 (Ala. 1988). Martello's tax returns are not relevant to the issues in this case and she should not be compelled to produce them.

## Defendants' "Compelling Need" Allegation Number Two

Defendants argue that there is a compelling need for Martello's and JYM's tax records because Plaintiffs dispute the identities of the members of Dr. Jeannette Martello Products, LLC, and because Martello gave evasive and incomplete answers to questions regarding how she characterized the distributions received by JYM from Dr. Jeannette Martello Products, LLC. For instance, Martello was evasive and would not respond when asked if Dr. Jeannette Martello Products, LLC issued a K-1 to her as an individual."

This line of questioning that Defendants reference was especially confusing to Plaintiff who was deposed for 6 hours and 34 minutes with no meal break. Realizing that Plaintiff did not understand what Defendants' attorney Rick Mitchell was getting at, Plaintiff's attorney objected.

> "MR. SOBODASH: Asked and answered. The document speaks for itself and vague as to issued." (**Exhibit 5,** page 238, page 29 of 42 of Doc. 53-2, lines 12 and 13).

> "MR. SOBODASH: Asked and answered. The document speaks for itself."
> (**Exhibit 5,** page 238, page 29 of 42 of Doc. 53-2, lines 17 to 18).

> "MR. SOBODASH: It has been answered." (**Exhibit 5,** page 238, page 29 of 42 of Doc. 53-2, line 22).

> MR. SOBODASH: Asked and answered. The document speaks for itself and vague as to issued. (**Exhibit 5,** page 238, page 29 of 42 of Doc. 53-2, lines 12 and 13).

To this day, Plaintiff does not understand what Defendants' attorney Rick Mitchell was asking during this line of questioning. As she explained during her deposition, income or loss from a single member LLC flows through to the individual. **Exhibit 5,** page 240, page 29 of 42 of Doc. 53-2, lines 1 to 3:

> "A. But I think that LCCs (sic), it trickles down to the individuals,
> Especially if it's a single member LLC."

> Q. Okay.

> A. Do you know what I'm saying?"

Plaintiff Martello further explained her understanding of the connection between an individual and a single member LLC. **Exhibit 5,** page 240, page 29 of 42 of Doc. 53-2, lines 14 to 16:

> "A. I'm pretty sure my accountant says if it's a single member LLC,
> The income only has to be reported by me individually."

When the line of questioning was *not vague and ambiguous*, Martello answered the question regarding the 2008 tax returns. **Exhibit 5,** page 240, page 30 of 42, page 242, lines 15 to 25:

> "Q. At the top it says Part III. Do you see the ordinary business income loss of negative $ 20,041?
>
> B. Yes.
>
> Q. So did you report that loss on your personal tax return for 2008?
>
> A. That is my understanding from my accountant.
>
> Q. And did you, did you or JYM, LLC send a section 8 Notice of Default to Product Quest based upon the Schedule K-1 issued to JYM, LLC for 2008?
>
> A. No."

Defendants already obtained the abovementioned information through Martello's deposition testimony. Defendants are intentionally misrepresenting a material fact to The Honorable Court when they wrote on page 6 of Defendants' Third Motion to Compel that Martello "resisted Defendants' efforts to obtain this information through her own testimony." Martello readily answered the questions regarding her 2008 tax returns when asked in a clear, not vague, unambiguous fashion. Therefore, there is no compelling need to compel Martello's tax returns.

## Defendants' Catchall

On page 7 of Defendants' Third Motion to Compel, Defendants argue:

> "Moreover, Martello's tax returns are uniquely suited to show her
> reliance on, and acceptance of, the financial disclosures relating to
> Dr. Jeannette Martello Products, LLC. There is therefore a compelling
> need for the disclosure of Martello's tax records in this case."

Again, it appears that this paragraph sheds light on the fact that Defendants desire Martello's tax returns for their "notice of default" affirmative defense. The problem with that is that Defendants never pled a

"notice of default" affirmative defense and therefore waived their right to this affirmative defense when it was not pled.

## Request No. 2

This request for Martello's state tax returns appear on page 7 of Defendants' Third Motion to Compel where they request a "complete copy of Martello's entire state tax return(s) for the years 2007, 2008, 2009, 2010, 2011 and 2012."

### Defendants' Relevance Allegation Number 1

Defendants argue that "Martello's state tax records are relevant to Plaintiffs' alleged damages for the same reasons that her federal tax records are relevant. Further, as discussed above in reference to Request No. 1, there is a compelling need for Martello's state tax records because Plaintiffs have resisted all of Defendants' efforts to obtain information concerning Plaintiff' alleged damages through other avenues." For the same reasons argued above, Martello's state tax returns are not relevant to any claim or defense in this case and no "compelling need" exists for their production since this information was obtained by Defendants through less intrusive means.

Eleventh Circuit precedent dictates that "litigants should not be required to produce income tax returns "as the price for bringing or defending a lawsuit" where the returns are not relevant. "The relevancy of the plaintiff's income tax returns to their claims for damages is tenuous at best." Defendants argued that "it needs the income tax returns to confirm the "full picture" of the plaintiff's income. This argument is pure speculation and conjecture by the defendant." *Camp v. Correctional Medical Services supra* quoting *Ex parte Morris*, 530 So.2d 785, 788 (Ala. 1988). Martello's tax returns are not relevant to the claims or defenses pled.

## CERTIFICATION

Plaintiff certifies that in good faith she conferred or attempted to confer with other affected parties in an effort to resolve the dispute without court action. This conference was held prior to Defendants filing their Motion for Order to Show Cause why Plaintiff Should Not be Held in Contempt.

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct.

Executed and Respectfully Submitted,

*Jeannette Martello*

Jeannette Martello, Plaintiff, In Pro Se

# CERTIFICATE OF SERVICE

## Martello vs. Product Quest et al, Case number 6:12-cv-1304-Orl-22GJK

I hereby certify that Mr. Robert Norway and Mr. Rick Mitchell of the law firm of Gray Robinson were served electronically via the email addresses of Robert.Norway@gray-robinson.com and Rick.Mitchell@gray-robinson.com with the Plaintiff's Motion for Protective Order and that a copy of this document will be served on them by Attorney Legal Services with a CD with the Exhibits at their offices located at:

Gray Robinson, 301 E. Pine Street, Suite 1400, P.O. Box 3068, Orlando, Florida 32801.


*Jeannette Martello*

Jeannette Martello, Plaintiff, In Pro Se

P.O. Box 914

South Pasadena, CA 91031

drmartello@gmail.com

(626) 993-8501