United States District Court
Middle District of Florida
Orlando Division

Jeannette Martello and JYM, LLC,
Plaintiff(s)

6:12-CV-1304-ORL-22-GJK

v

Product Quest Manufacturing, LLC; et al.,
Defendant(s)

## PLAINTIFF'S EVIDENTIARY PROFFER

Plaintiff *In Pro Se* files this evidentiary proffer in accordance with Florida Statute Section 768.72

and *Royal Marco Point I Condominium Association, Inc. v. QBE Insurance Corporation*, No. 3:07 CV-

16, (M.D. Fla. June 2010).

### Punitive Damages are Warranted

Defendant John Regan individually and as an officer of Defendants Product Quest

Manufacturing, Inc. and Product Quest Manufacturing, LLC (hereinafter collectively PQM) are guilty of

"intentional misconduct" as defined in 768.72(2)(a):

> "Intentional misconduct" means that the defendant had actual
> knowledge of the wrongfulness of the conduct and the high
> probability that injury or damage to the claimant would result
> and, despite that knowledge, intentionally pursued that course
> of conduct, resulting in injury or damage."

Defendant John Regan as principal of PQM "knowingly condoned, ratified, or consented to such

conduct in accordance with 768.72(3)(b). Alternatively, Defendant John Regan as principal of PQM

"engaged in conduct that constituted gross negligence and that contributed to the loss, damages, or injury

suffered by the claimant" as codified in 768.72(3)(c). In accordance with case law, Plaintiff *In Pro Se*

respectfully proffers this evidence in order for The Honorable Court to determine "whether a reasonable

basis has been shown to plead a claim for punitive damages." *Estate of Despain v. Avante Group, Inc.*, 900 So.2d 637, 644 (Fla. 5th DCA 2005).

**Count I.**

In Count I of the Complaint, Plaintiff alleges that Product Quest Manufacturing, Inc. and Product Quest Manufacturing, LLC (PQM) breached the Operating Agreement. Count I reads, "[P]ursuant to Article VI, Section 6.5 and Article XIV, Section 14.2 of the Operating Agreement, The Company's accounts, books, and records were to be kept at its principal place of business and provided to its member with bi-monthly balance sheets and income statement and annual accountings and financial statements." Plaintiff demanded an accounting and, to date, have not received a full accounting of the books due to spoliation or concealment.

### A. Creation of Two Quick Books' Files for Dr. Jeannette Martello Products' LLC

One set of invoices was produced at the Gray Robinson law offices on October 29, 2013 and another set of invoices were turned over during Defendants' supplemental production January 2014. The invoices that were produced twice were different in a number of ways. The most glaring difference was the fact that some of the invoices billed to the DJMP joint venture in the initial production had "Product Quest Manufacturing LLC" printed across the top of the invoices. Representative samples of invoices that were produced in October 2013 include the ones attached as **Exhibit 1**. There are many pages of invoices in both Defendants' initial production and in Defendants' supplemental production. A partial list of the duplicated invoices is present here. The duplicated invoice numbers are 57730, 58325, 59855, 60066, 60198, 61443, 61450, 61686 and 61917. These invoices have various dates and amounts on them, but they all have an "entered" stamp on them and indicate that the joint venture DJMP was billed for some good or service and that the amount owed is still outstanding.

Defendants' produced new invoices in supplemental production which revealed the name of the company in the left upper hand corner as "PRODUCT QUEST MFG., LLC". All of these invoices revealed a zero balance owing and that the cost of the goods or services had been paid by the DJMP joint

venture. These invoices are attached as **Exhibit 1** with the following Bates numbers PQM.SUP.005026, PQM.SUP.005029, PQM.SUP.005033, PQM.SUP.005034, PQM.SUP.005035 and PQM.SUP.005039.

The main difference between these duplicated invoices is that the set of invoices produced during Defendants' initial production, the company listed on the left upper hand area is "Product Quest Manufacturing LLC". These invoices are attached as **Exhibit 1** with the following Bates numbers PQM001736, PQM001732, PQM001718, PQM001717, PQM001716 and PQM001711.

The itemized invoices listed above were produced a second time during Defendants' supplemental production. This time, the company in the left upper hand corner appeared as "PRODUCT QUEST MFG., LLC". Quick Books auto-populates an invoice based on the name of the company that a person has entered into the computer for the name of the generating entity. As an example, if "Product Quest Manufacturing LLC" generates an invoice, then "Product Quest Manufacturing LLC" will appear at the top of the invoice. Alternatively, if the entity is called "PRODUCT QUEST MFG., LLC", Quick Books will auto-populate the name "PRODUCT QUEST MFG., LLC" at the top of invoice.

On page 18 of 22 of his report, Defendants' expert Timothy O'Toole made a point of stating that he thought that the DJMP QuickBooks file updated or changed to the 2012 dates "when a data entry person opened the file and changed the vendor name from "Product Quest Manufacturing, Inc." to "Product Quest Manufacturing". **Exhibit 2.** If Defendants' expert is right, then when a vendor name is changed, the alteration should be reflected in the Audit Trail. For reference, look at invoice number 59855 to see if this theory is correct.

During a review of the DJMP Quick Books file, it was discovered that an Audit Trail report could be generated by the program. Audit Trail makes it possible to view all alterations that have been made to the particular Quick Books file; what type of changes were made and *when* they were made. The Audit Trail feature also prominently shows when entries were made for the *first time* and when the entries were

*last modified.* The alterations are featured in bold and italic by the Audit Trail feature which has proven to be invaluable. A copy of the 210 page DJMP Audit Trail report is attached as **Exhibit 3.**

On page 55 of 210 of the Audit Trail report, invoice number 59855 is listed, the names "Product Quest Mfg" and "Product Quest Mfg…" appear. Computers do not automatically abbreviate words. Humans do. Quick Books' Audit Trail differentiates between capital letters because invoice number 59855 located at PQM.SUP.005033, the vendor name of "PRODUCT QUEST MFG., LLC" appears in all capital letters. An inspection of page 68 of 210 of the Audit Trail report reveals that Quick Books *does* differentiate capital letters. Under check 1013 for 4/10/2007, the entity "JYM LLC" appears in all capital letters.

According to the explanation of Defendants, Chief Financial Officer Bill Jennings and Defendants' own expert O'Toole, the name changes between "Product Quest Manufacturing LLC" and "PRODUCT QUEST MFG., LLC" or vice versa and the changes between capital and non-capital letters would be reflected in the Audit Trail report. Every change is reflected in the Audit Trail report.

The only explanation for why the Audit Trail report did not show a change between "Product Quest Manufacturing LLC" and "PRODUCT QUEST MFG., LLC" would be if there were two different Quick Book files for the joint venture of Dr. Jeannette Martello Products, LLC. The fact that two different versions of Quick Books files for Dr. Jeannette Martello Products, LLC exist explains why pages 1 through 67 of the Audit Trail reflected bills that were a) either entered into Quick Books for the first time on 1/17/2012 and/or b) that the bills were modified on 1/17/2012 after being previously entered. Applying the *Calixto* factors to my case, it appears that bad faith exists for Defendants' alteration of their Quick Books file to create *two* Quick Books files for the DJMP joint venture: 1) an unaltered file for Quick Books evidence once existed that could fairly be supposed to have been material to the proof of my claims pled in the complaint and to prove damages; 2) Defendants engaged in an *affirmative act* causing the Quick Books files to be altered by entering invoices into the system on January 17, 2012, five years after the goods or services were allegedly rendered to the joint

venture DJMP. 3) Defendants altered this Quick Book file for the DJMP joint venture on January 17, 2012 after a litigation hold should have been placed on December 15, 2010 and six days after Regan resigned as DJMP's resident agent on January 11, 2012. Therefore, when the invoices were entered into the Quick Books' file for the first time on January 17, 2012, Defendants knew that they had a duty to preserve the Quick Books' evidence. 4) The affirmative act of Quick Books alteration caused the loss of the real financial information. The reasons for this spoliation cannot be credibly explained as not involving bad faith.

### B.   Proof of Invoice Creation after Litigation Hold

A litigation hold should have been placed by Defendants as early as December 15, 2010. This is when Defendants were given the "heads up" by attorney Greg Snell that Martello was looking for legal representation to obtain financial records. Several instances of invoice alterations exist.

The name of the joint venture was Dr. Jeannette Martello Products, LLC (hereinafter DJMP). Plaintiff signed the License Agreement which became part of the Operating Agreement in her individual capacity and on behalf of her single member JYM, LLC. Invoice number 51176 was produced at Gray Robinson (Bates number PQM004203) which was again produced in supplemental as Bates number PQM.SUP.004911 and PQM.SUP.004912. Invoice 51176 which is attached as **Exhibit 4** was created after the initiation of this lawsuit. On page PQM.SUP.004911, the invoice reads:

> "Due to original pricing being estimated and not acutual (sic), the accounting
> Department has made the following adjustments.
> Buffing Grains Kit - *JYM, LLC* was billed for 35,838 kits @ $ 3.46...
> 4 oz Cleanser, *JYM, LLC* was billed 6,844 pcs @ .57...
> Night Cream, *JYM, LLC* was billed 11,836 pcs @ .97... *(emphasis added)*

On page PQM.SUP.004912, the invoice continues:

> Daily Measures, 30 day, *JYM, LLC* was billed 44,583 pcs @ $ 4.02...
> 5 Day Trial Kit *JYM, LLC* was billed 201,396 pcs @ $ 4.02... *(emphasis added)*

JYM, LLC was not billed anything. The joint venture, Dr. Jeannette Martello Products, LLC was billed, not JYM, LLC. It appears that invoice 51176 was created after a litigation hold should have been placed by Defendants because it lists the name of the entity *JYM, LLC* that is suing PQM and Regan instead of listing the name of the DJMP joint venture in the body of the invoice.

Another example of spoliation is that of purchase order number 32588 which appears to have been created after a litigation hold should have been placed. This purchase order is dated 12/6/2006 and lists a vendor as Corrugated Concepts (Bates number page PQM.SUP.007253). On the top left hand corner, the entity is listed as "Product Quest Manufacturing LLC". Invoice 32588 is attached as **Exhibit 5.** The problem with this purchase order is that "Product Quest Manufacturing LLC" was not created until March 27, 2007. A copy of the print out from the Florida Secretary of State website for "Product Quest Manufacturing LLC" and the entity's Electronic Articles of Organization for a Florida Limited Liability Company are attached as **Exhibit 6.**

### C. Defendants' Failure to Produce Walgreens' Purchase Orders Despite Repeated Requests Since 2007

A January 10, 2007 letter written by Product Quest principal Todd Kwait is attached as **Exhibit 7,** Bates numbered pages PQM 000775 to PQM 000784. On page 1, under point 3 of the letter, Defendants' principal Todd Kwait declared, "[W]ith respect for your (sic) request of copies of all purchase orders, please note that purchase orders are submitted by Walgreens electronically via EDI. We can provide a listing, *but hard purchase orders are not generated by email or any other sort of transmission."* *(emphasis added).*

Kwait intentionally misrepresented a material fact that he knew was false when he made it that "hard purchase orders are not generated by email or any other sort of transmission." During his January 23, 2014 deposition, PQM's Chief Financial Officer Bill Jennings was asked about the Walgreens purchase orders and revealed that PQM used True Commerce software.

This line of questioning begins on page 7 of the partial transcript attached as **Exhibit 8.** Bill Jennings' testimony reveals that purchase orders can be printed out. (page 10, lines 1 through 3 of **Exhibit 8**) Walgreens' purchase orders have yet to be produced by Defendants despite Plaintiffs' repeated requests since 2007.

On March 7, 2014, Plaintiff called and spoke with a True Commerce representative who told me that *True Commerce EDI purchase orders can be printed out and saved in PDF format.* Julia Welt, True Commerce EDI Sales Specialist noted in her email to me that "we have a way to print the orders you would receive in our solution to a *PDF* if you needed to." **Exhibit 9.** The attachments sent to Plaintiff by True Commerce are attached as **Exhibit 10.**

It appears that Defendants have engaged in bad faith discovery misconduct by intentionally concealing and withholding Walgreens' purchase orders. The Walgreens' purchase orders' evidence exists. Defendants had a duty to preserve the evidence. The Walgreens' purchase orders' evidence is crucial to Plaintiffs case so that she may ascertain exactly how much Walgreens purchased from Defendants of DJMP's skin care products. The Walgreens purchase orders will determine how much Walgreens paid Defendants for the skin care products that were produced for the DJMP joint venture. Since the agreement was for the net profits to be split 50/50 the gross sales of the skin care products to Walgreens is of utmost importance. Furthermore, in her complaint, Plaintiffs allege that skin care product over-production occurred with the resultant excess inventory. This excess inventory was ultimately written off and was not used to generate any income. PQM made money no matter what (with a profit margin and markup) since it made money as long as any product was produced.

Defendants have intentionally, willfully and in bad faith withheld crucial evidence of Walgreens purchase orders and this withholding of evidence has substantially prejudiced Plaintiffs.

### D.  Defendants Interference with Walgreens' Third Party Subpoena

Defendants are liable for the intentional misconduct of their attorneys. When Defendants were not forthcoming with Walgreens' purchase orders, Plaintiffs approached Walgreens. Defendants and their

attorney Rob Norway have intentionally and in bad faith interfered with a crucial non-party subpoena served upon Walgreens over a month before the January 31, 2013 discovery deadline. Plaintiffs served two subpoenas on nonparty Walgreens on December 23, 2013, over a month before the January 31, 2014 deadline. Documents listed in the Walgreens' subpoena were supposed to be delivered to Plaintiffs by January 6, 2014. Acknowledging service of the subpoenas, Walgreens' Senior Legal Assistant, Ms. Boryc, requested that a Motion for a Protective Order be filed with the Court. A stipulated Motion for Protective Order was filed and signed by The Court. Plaintiffs noticed a Walgreens' deposition for January 13, 2014, the location was set for the law offices of Perkins Coie in Chicago and a deposition reporting agency was scheduled. Ms. Boryc, Walgreens' Senior Legal Assistant, noted that she would inquire and find out who the person most knowledgeable for the deposition would be. Ms. Boryc responded to the deposition notice by informing Plaintiffs that the documents requested in the Walgreens subpoena would not be available in time for a January 13, 2014.

Ms. Boryc had been informed by Plaintiffs' attorneys on a number of occasions via email and phone that the discovery deadline for production was January 31, 2014. Ms. Boryc informed Plaintiffs that she should have some responsive documents by January 21, 2014, "I hope to have at least some of your requested data to you by the 21st."

On January 21, 2014, Defendants' attorney Rob Norway interfered with Walgreens' third party subpoena. In his email dated January 21, 2014, Rob Norway wrote, "[I]n the Martello litigation pending in Florida, Defendants have not been advised as to the status of Plaintiffs' third party subpoenas. What is the current status?...Please also see the attached case management and scheduling order, particularly page 3, which directs Plaintiffs to serve all discovery so as to allow for a response prior to the end of the discovery deadline. The deadline in this case is January 31, 2014." **Exhibit 11.**

In response, Plaintiffs informed Ms. Boryc, "[Y]ou are still required to provide documents in response to the subpoena in a timely manner. You should disregard counsel's efforts to interfere with the required production." **Exhibit 11.** After receiving this email from Defendants' attorney

Rob Norway, the documents that Ms. Boryc noted should be available on January 21, 2014 were no longer available. When the discovery deadline date of January 31, 2014 arrived, Walgreens produced a single PDF with various values in columns and no description as to what the numbers signified. Did the numbers signify the number of units sold by Walgreens? The number of units purchased from PQM by Walgreens taking into account returns? To this date, these numbers and their significance have to be defined.

Ms. Boryc informed Plaintiffs via email on January 31, 2014 that she would have responsive documents available for them the following week. On February 4, 2014, Ms. Boryc of Walgreens informed Defendants' attorney Rob Norway, "I have received an electronic copy of Product Quests vendor file *as kept by Walgreen Co. in the normal course of business.*" **Exhibit 12.** *(emphasis added).*

In response, Mr. Norway directed Ms. Boryc not to provide Plaintiffs with any documents since the discovery period had already ended the week before. Mr. Invictus and Mr. Sierra contacted Walgreens and the 2500 pages of documents were turned over to Defendants' attorneys to examine. Plaintiff wonders why, if Walgreen Co. kept an electronic copy of Product Quest's vendor file "in the normal course of business". . . why it took so long for Walgreens to produce this file. Why Walgreens wait until after the close of discovery to announce that they now had the file?

It appears that Defendants have engaged in bad faith discovery misconduct by interfering with Walgreens' third party subpoena. After the 2500 page vendor file was turned over to Defendants' attorneys for inspection, they have intentionally concealed and withheld pertinent Walgreens' documents that were made available to Plaintiffs by Walgreens. Defendants have intentionally, willfully and in bad faith interfered with Walgreens' third party subpoena. Furthermore, Defendants' attorneys have withheld crucial evidence Walgreens' documents that would document what gross sales income was for the DJMP's joint venture. As a result, Defendants' discovery misconduct has

substantially prejudiced Plaintiffs. Ultimately, Plaintiffs were provided with less than 150 pages of redacted documents out of the 2500 pages that Walgreens had informed Plaintiffs were available.

From the evidence proffered, it appears that "intentional misconduct" occurred. Defendants had actual knowledge of the wrongfulness of their attorneys' misconduct and the high probability that injury or damage to Plaintiff would result. Despite that knowledge, Defendants intentionally pursued that course of conduct which resulted in injury or damage to Plaintiff. Alternatively, Defendants knowingly condoned, ratified or consented to such misconduct on behalf of their attorneys.

### E.   Defendants' Deficient Document Production

Plaintiff requested inspection of all documents relating to the DJMP joint venture from March 2006 onward. Four full boxes were filled with thousands of pages of documents were produced during the October 2013 production. These papers were inspected, copied and scanned during a few day trip in October 2013.

The document inspection was deficient. Receipts, cancelled checks and proof that PQM paid for expenses that it claimed was not present for well over 99% of the expenses claimed. A ticker tape print outs from an old fashioned key pad that tabulated to expenses totaling over $723,101.11 with minimal supporting documentation. **Exhibit 13.** Defendants produced incomplete bank statements for the bank account of Dr. Jeannette Martello Products, LLC. No cancelled checks were produced that had been written from the DJMP bank account to PQM. Defendants' Chief Financial Officer Bill Jennings was asked why Defendants did not obtain copies of complete DJMP bank statements and cancelled checks in response to Plaintiffs' discovery requests. This excerpt appears on page 5 of 26 of **Exhibit 8** and on pages 3 and 4 of the partial transcript attached. This $ 5 per copy charge appeared to be the reason why Defendants did not order DJMP bank statements and cancelled checks in response to Plaintiffs' discovery requests.

Yet Defendants' attorney Rob Norway represented that PQM "does about $ 100 million of production per year. It has facilities in five or six states." **Exhibit 14,** page 9 of 37 of the partial transcript and page 10 of 38 of **Exhibit 14.** As another example, a handful of Roadway and UPS invoices were produced that would have corroborated freight bills that totaled $ 253,467.86. A copy of the Quick Books freight bill report obtained from Defendants' Quick Books CD production is attached as **Exhibit 15.**

It appears that Defendants withheld crucial evidence that substantially prejudiced Plaintiffs and contributed to an incomplete Plaintiffs' expert report. The documents requested by Plaintiffs for this document inspection exist. The withheld documentary evidence is crucial to Plaintiffs case in order to verify sales income, verify expenses claimed and, ultimately, in order to ascertain damages. Defendants intentionally, willfully and in bad faith withheld crucial evidence that would have aided Plaintiffs and her expert in coming to a more informed conclusion regarding damages. As a result, Defendants' discovery misconduct has substantially prejudiced Plaintiffs.

## F. Defendants' Spoliation Through Concealment of 2006 Financial Records

Defendants intentionally, willfully and in bad faith concealed crucial evidence of the 2006 financial records. This concealment has substantially prejudiced plaintiffs. Defendants' principal Todd Kwait noted that as of January 4, 2007 that PQM had expended over $1,294,690.71 dollars on behalf of the joint venture. **Exhibit 7,** page 3 of 11 and top of page 2 of the actual letter. Since the Operating Agreement of the joint venture provided for a 50/50 net profit split, these expenses are crucial evidence of whether or not Product Quest actually paid for any of these expenses on behalf of the joint venture. If these expenditures were not made on behalf of the joint venture, that would increase Plaintiffs' damages to 50% of $1,294,690.71 or to $ 647,345.35.

Furthermore, if the 2006 financial records and vendor files had been produced and did not indicate that expenses were paid for by Product Quest on behalf of the joint venture, the question of fraud

would be raised which may involve punitive damages. Defendants failed to produce any vendor files from 2006 which would have corroborated or disproven $1,294,690.71 of expenses that were ultimately paid to PQM and deducted off of DJMP's gross sales income.

PQM's Vice President Rick Webb was present the entire time during document inspection the final week of discovery 1/27/2014 through 1/31/2014. On Monday, 1/27/2014, Plaintiff asked Rick Webb where all the 2006 boxes were. There were about 50 to 60 boxes produced for me to go through to "find" various receipts to back up expenses. In response to Plaintiff's question, Rick Webb emailed attorney Rob Norway in front of Plaintiff. Norway told Rick Webb that the 2006 boxes were "not available." Plaintiff was clearly disappointed. As a result, Rick Webb told me that if I was "*specific*", he might "*find*" me *specific records* from 2006.

It appears that Defendants withheld crucial evidence that substantially prejudiced Plaintiffs and contributed to an incomplete Plaintiffs' expert report. The 2006 financial documents requested by Plaintiffs for this document inspection exist to this day as evidenced by Rick Webb's statement to me about finding specific records from 2006. Defendants had a duty to preserve the 2006 financial records as of the litigation hold date of December 15, 2010. Defendants had a duty to preserve the 2006 financial records based on breach of contract statute of limitations which is five years in Florida. Since vendor files involve written contracts, Defendants should have preserved all 2006 vendor files until December 31, 2011, a year after the litigation hold should have been placed on December 15, 2010. The withheld documentary evidence is crucial to Plaintiffs case in order to verify sales income, verify expenses claimed and, ultimately, in order to ascertain damages. Defendants intentionally, willfully and in bad faith withheld crucial evidence that would have aided Plaintiffs and her expert in coming to a more informed conclusion regarding damages. As a result, Defendants' discovery misconduct has substantially prejudiced Plaintiffs.

### G.   Defendants' Shell Game and Incomplete Production of Bank Records

Defendants intentionally withheld the existence of at least three different bank accounts which were used to conduct business on behalf of the DJMP joint venture. This withholding of banking information and bank accounts is evidenced during the deposition of Regan in the partial transcript that is attached as **Exhibit 16** (page 16 of 30 of the exhibit and lines 4 and 5 on page 14 of the partial transcript). The transcript has an error and refers to the bank account number as 200078376341. The actual bank account number is 2000783763471 and appears on the back of first five checks that appear in **Exhibit 17.**

During his deposition, Defendant Regan was asked why checks written off of the DJMP bank account to PQM were deposited into a Derm Effects' bank account in 2007 when Derm Effects had dissolved on September 15, 2006. Lines 4 through 7 of page 7 of **Exhibit 16.** Defendant Regan blamed this occurrence on the rubber stamp. This rubber stamp appeared to be the culprit for five checks totaling $ 1,567,802.98 to be deposited into a bank account for a dissolved entity called Derm Effects. A copy of Derm Effects' Florida Secretary of State paper work for dissolution are included as **Exhibit 18.**

Defendants have not produced a single bank statement for the 3471 bank account in which over $ 1.56 million dollars was deposited. The $ 1,567,802.98 was written in checks by the DJMP joint venture to PQM. These checks and others that were written by DJMP to PQM are attached as **Exhibit 17.**

Many other bank accounts were revealed to exist through which the DJMP joint venture's funds were deposited to. These bank accounts included those ending with 3471; 8917; 6316 and others. It appears that funds circle in and out of the various Product Quest bank accounts similar to a "shell game" described by other Federal Court Judges. No distinction or respect between the various corporate entities exist. An example of the way the funds go in and out of the various bank accounts for Product Quest

Manufacturing, Inc., Product Quest Manufacturing, LLC and Product Quest Logistics can be seen through the various deposit slips that were produced by Defendants during discovery.

## Count II. Defendant Regan's Hiring of His Sister

According to the testimony of Chief Financial Officer Bill Jennings, no other agent of PQM was paid for out of DJMP funds. Defendants had a chance to hire Katie Steines, a known marketing expert with an excellent track record. Instead, Defendants chose to hire Regan's sister, Christine Lunday, who had worked with a magazine in the past.

Whilst Christine Lunday was being paid by DJMP funds, unbeknownst to Plaintiff, invoices were being submitted to PQM by Ms. Lunday under the name Imogene Communications. There was no reason for Martello to believe that Lunday's time was being paid for out of the joint venture DJMP's funds. Plaintiffs did not discover that Lunday was paid for out of DJMP's funds until she obtained a copy of Defendants' general ledgers in late 2010. Martello did not recognize several entities, but two stood out in particular. One entity was called Imogene Communications which appeared to have been paid several times out of DJMP joint venture funds. Email searches for the name Imogene revealed that Lunday had identified herself in emails to Editors as a Principal of Imogene Communications. **Exhibit 19.**

Martello had reason to believe that Lunday was an employee of PQM. In fact, there were several reasons for Martello to believe this. In his December 27, 2005 email, Regan made it clear that PQM would pay for marketing. **Exhibit 20.** Martello relied upon Regan's representation of the material fact that marketing would be paid for by PQM. PQM marketing manager Tiffany Radikopf's salary was not paid for out of DJMP funds. Graphic designer EJ Chang's salary was not paid for out of DJMP funds. Suzanne Wender accompanied Martello on several beauty advisor meetings throughout the United States. Ms. Wender's salary was not paid for out of DJMP funds. Lunday made it clear that she attended weekly Monday meetings with Walgreens with other people from PQM, including but not limited to John Regan

and Rick Webb. Martello had asked to attend these weekly conference calls since a portion of the call was spent on the DJMP skin care products on sale at Walgreens. Martello was informed that she was not able to attend the weekly conference calls because a majority of the call was spent on discussing other PQM skin care product lines.

Lunday made it clear that she performed the marketing for several other PQM including those for Dr. Jan Adams, Mineral Matters, Apothecary and Men's Zone, to name a few. **Exhibit 21.** Lunday had an email address of christinel@productquestmfg.com. Although John Regan had an email address of alocjr@aol.com and Todd Kwait had an email address of tckwait@aol.com, the fact that Lunday had an email address associated with product quest made it appear that she was an employee of PQM. Martello and her elderly mother attended a dinner with Lunday and her boyfriend during the time that Martello was giving presentations at the AARP convention in Boston, Massachusetts. This dinner is commemorated in an email that will be presented at the hearing. While we were reviewing the menus and before ordering dinner, Lunday announced to everyone at the table, "[O]rder anything that you want. The company is paying for it." It was obvious that the company that was paying for the dinner was PQM.

Several people from PQM and from Robert J. Kwait and Associates were involved with the joint venture of DJMP, including but not limited to, Tiffany Radikopf (marketing manager of PQM, Regina Lim (chemist for PQM) Marilyn Radikopf (controller for PQM) Rick Webb (Vice President of PQM), Todd Kwait (principal of PQM and Robert J. Kwait and Associates), John Regan, Scott Radikopf, graphic artist EJ Chang and Suzanne Wender of (Robert J. Kwait and Associates). Not a single other person's salary was paid for out of DJMP's funds. Lunday accompanied PQM principals and Walgreens executives to Italy for a tradeshow.

In fact, it was obvious that Defendants tried to hide the fact that marketing was being paid for by the joint venture as opposed to by PQM. In his letter, Todd Kwait lists "promotional support" and itemizes Imogene Communications. Nowhere does he list Christine Lunday's name. In fact, even though Lunday and Martello started working together on the DJMP product launch in 2/2006, it appears that

Imogene Communications started being paid by the joint venture on 6/19/2006. Therefore, at some point in time between 2/2006 and 6/19/2006 Regan independently made the decision for his sister Christine Lunday (aka Imogene Communications) to be paid for out of DJMP joint venture funds.

Discovery has revealed that Christine Lunday normally invoices PQM for her time. It is interesting to note that Regan's sister Christine Lunday used the name Imogene Communications on the top of her invoices whenever she invoiced the joint venture DJMP. **Exhibit 22.** When Lunday invoiced PQM, she used her full name Christine Lunday and not the entity's name of Imogene Communications. **Exhibit 23.**

Marketing expert Katie Steines was involved with several conference calls and received no compensation for such. Even though Katie Steines would have been a great marketing expert for the DJMP line of skin care products, she was passed over by PQM in favor of Defendant Regan's sister, Christine Lunday. Defendant Regan breached his fiduciary duty of loyalty to the DJMP LLC and to his fellow Manager Martello when he chose his sister Christine Lunday who was a novice marketing person instead of choosing Katie Steines, an experienced public relations specialist with a known track record.


**Count IV. Walgreens' Contract and Purchase Orders**

In their Answer Defendants' attorney Richard E. Mitchell lied in paragraph 47. He wrote, "[A]dmitted that at all material times, PQM INC., or PQM LLC have had an ***oral or implied vendor agreement*** with Walgreens Company, which enabled PQM LLC to sell skin care products, including DJMP LLC products, to Walgreens Company." *(emphasis added).* During the recent March 11, 2014 hearing in front of The Honorable Judge Kelly, Defendants admitted to the fact that a written vendor agreement existed on page 116 of 138, lines 12 through 17.

According to the Uniform Commercial Code, every purchase order is an agreement or contract. Therefore, Defendants argument that "DJMP did not enter into an agreement with Walgreens for the sale of DJMP's cosmetics" is a misrepresentation. To date, Martello has yet to see a single purchase order

from Walgreens to PQM. According to the Uniform Commercial Code which governs the relationship and business between two experienced merchants like Walgreens and PQM, every purchase order is a contract. *MidAtlantic International, Inc. v. AGC Flat Glass North America, Inc.*, No. 2:12cv169, (Eastern District of Virginia, February 7, 2014). The fact that experienced merchant PQM considers a purchase order a contract is illustrated by the wording "*purchase orders and/or contracts*" on paragraph 2, page 1 of the Operating Agreement.

Section 5.3.5(e) of the Operating Agreement reads, "[T]he Managing Members will actively participate in all decisions as they relate to the development of and approval of all pricing, *purchase orders and/or contracts.*" *(emphasis added).* Next, addressing Section 5.35 of the Operating Agreement which reads that "the following actions shall be taken by the Managers *only with the unanimous consent of the Members:* (e) Notwithstanding any provision to the contrary, entering into *any agreement with Walgreens drug stores.*" *(emphasis added)*

The Operating Agreement specifically notes that any agreement with Walgreens drugs stores requires a unanimous consent of the Members. It has not gone unnoticed that the Walgreens' vendor agreement was revised on January 30, 2006, the very date that Defendant Regan and Plaintiff Martello signed the Operating Agreement and attached Exhibit C of the License Agreement. This newly revised vendor agreement that was produced by Defendants was signed by Defendant Regan on April 6, 2006, after DJMP was formed and signed by Walgreens in September of 2006, right before DJMP products were shipped to Walgreens.

Therefore, from the evidence proffered, it appears that a vendor agreement with Walgreens was negotiated by Defendants without Plaintiff's involvement or consent. Furthermore, none of the purchase orders (contracts) were negotiated or agreed upon by Plaintiff.

## Count V.  Defendants Decreased the Distribution of Profits by Increasing DJMP's Expenses

Defendants were on both sides of the deal.  Defendant signed the DJMP checks that were made out to Defendant PQM.  PQM breached its contract with Plaintiffs by paying itself more for "expenses" which decreased the amount of net profits that were available for distributions.  This padding of expenses took place in several different ways.  First, the cost of fill alone was over $ 900,000 as can be seen on the Profit and Loss statement as well as a separate report that was created from the Quick Books file that was produced by Defendants.  PQM created invoices for work that was performed by a third party in breach of the Operating Agreement.  According to their Defendants' expert, Mr. O'Toole, the Operating Agreement did not allow for subcontracting work to be performed.

According to discovery through invoices that were discovered at the Holly Hill facility the last week of discovery, the actual blend and fill work for Daily Measures was performed at a company called LF of America.  According to invoices attached as **Exhibit 24**, one can see that a strip of five ampules (the cost of the ampules) plus the cost of filling the Daily Measures into the five strip was invoiced to PQM for 58 cents.  Those same batches of chemicals were "blended and filled" by PQM and the joint venture DJMP was invoiced $ 2.51 and in some instances $ 4.02 for that very same work during the same time period on the same batches of chemicals.  These ampules were then shipped to PQM from LF of America.

Throughout his deposition, Defendant Regan makes a point of saying that he charged cost for everything else, components, packaging, etc.  This is simply not the case.  One example alone notes that PQM was charged 25 cents for an empty strip of five ampules or 5 cents per ampule.  PQM turned around and charged the DJMP joint venture 83 cents per ampule for those very same ampules.  These invoices will be presented at the hearing for Proffering of Evidence.  Defendants note that "DJMP's profit and loss statements show that the LLC "made a net profit" in only a single fiscal year, 2007.  This can't be verified to be true.  To this date, Defendants have concealed, withheld and thus spoliated by not turning over a single Walgreens purchase order.

After the initial Operating Agreement and License Agreement were signed on January 30, 2006, Regan fraudulently induced Martello to sign a Mutual Consent so that he could partner up with Stephens Capital Partners. Defendant Regan also perpetrated a fraud upon Martello when he intentionally misrepresented the fact that 100% of Product Quest Manufacturing, Inc.'s assets would be turned over to Product Quest Manufacturing, LLC upon its formation. In actuality, the information that has been turned over by Defendants, which includes excel spreadsheets and deposit slips reveals that Product Quest Manufacturing, Inc. continued to sell, invoice and collect money from the sale of DJMP skin care products after the formation of Product Quest Manufacturing, LLC on March 28, 2007. Evidence to prove these facts will be proffered at the hearing.

## Count VI. Covenant of Good Faith and Fair Dealing; Duty of Loyalty and Care

Defendants and Plaintiff were involved in a confidential or fiduciary relationship since they were involved in a joint venture together. When this type of relationship exists, both the Eleventh Circuit and Florida Courts stress that duties can't be waived between the parties. These non-waivable duties of loyalty, care, good faith and fair dealing were breached by Defendants and economically damaged Plaintiffs when work was subcontracted out for 58 cents and the joint venture was invoiced $ 2.51 for the same work that was not performed by Defendants but performed by a third party, LF of America. Marking up costs (e.g. ampules) and even freight charges definitely breached these non-waivable provisions.

## Count VII. Misappropriation of Plaintiff's Name

According to the contract, Martello was to give her written authorization for her name and likeness to be used on any products for promotion. PQM never approached Martello to use her name or likeness in the sale of their Provectin line of skin care products. It appears from email evidence though that they were well aware that Martello's name and likeness was being used to sell Provectin skin care

products at Walgreens. This misappropriation of Plaintiff's name confused Walgreens' customers who bought non-DJMP products thinking that they were in her line up. **Exhibit 25.**

## Count VIII. Plaintiff's Trademark Claims of Intentional Infringement

Martello already had two nationally broadcast radio shows, one on Health Radio Network and another one on Business Talk Radio Network at the time that PQM approached her to discuss a joint venture. Martello had already appeared on several national television shows prior to meeting PQM as well. Martello's name had acquired secondary meaning as being associated with cosmetics (skin care and surgery) long before PQM approached her for this joint venture.

Furthermore, with respect to trade dress which is treated similarly to trademarks, discovery has revealed that PQM intentionally infringed upon the trade dress of the DJMP skin care products when it created the Mineral Matters line of skin care products. A Shorewood Packaging invoice will be presented at the hearing which shows that the packaging *reorder* for DJMP's night cream was the same as that for Mineral Matters. With respect to time, DJMP's skin care products (including the night cream) came first, followed by Mineral Matters (which was not in the DJMP line) and then the reorder for Martello's night cream packaging. It is obvious through this invoice that PQM intentionally infringed upon the trade dress of the DJMP product line. Photographs of the Mineral Matters products appear side by side with the DJMP skin care products. **Exhibit 26.** According to the *Sunbeam* case (which is cited by Defendants), trade dress can even include the way that a mixer or blender looks. Trade dress is designed to have an immediate impact on buyers so that they can readily and immediately recognize the origin of the product. As is pointed out by Defendants, consumer survey evidence is not needed at all. In fact, Plaintiffs have an email from a Walgreens customer who confirms actual confusion based on the similarity of the Mineral Matters packaging with that of the DJMP skin care products. This customer was also confused because the Mineral Matters line of products were included under Martello's name on Walgreens' website. Since

the customer lives in Cabo San Lucas, Mexico where no physical Walgreens stores exist, the association with Walgreens' website is apparent.

## Counts IX through XVI. Piercing the Corporate Veil.

Defendants used the corporate entity for improper purpose which the Court's have recognized includes the commingling of funds. Corporate funds were used to purchase a $ 21.27 kitty bed from Wal Mart with corporate check number #3263 on 10/23/2008 and listed it under corporate expense account 6050. Evidence will be presented at the hearing that child support was paid for out of the PQM account (Inc. or LLC). Private office rent was paid for out of Product Quest Manufacturing corporate funds for the private offices of Robert J. Kwait and Associates, Kingswood Records, LLC and Ezzie Films, LLC. All of these offices are located at 23230 Chagrin Blvd. Office rent was paid for by Product Quest Manufacturing corporate funds for the private office of Robert J. Kwait and Associates, a separate Ohio corporation.[1] The Robert J. Kwait and Associates' offices are located at 23230 Chagrin Blvd. Robert J. Kwait and Associates is an Ohio corporation and has been separately incorporated since 1981. Todd Kwait owns and controls Kingswood Records, LLC, the offices of which are located at 23230 Chagrin Blvd. Todd Kwait owns and controls Ezzie Films, LLC with his wife, the offices of which are located at 23230 Chagrin Blvd. Robert J. Kwait is the Manager of Product Quest Logistics, LLC and he is the past President of Product Quest Manufacturing, Inc. Todd Kwait is the Manager of Product Quest Logistics, LLC and he is a Manager of Product Quest Manufacturing, LLC. As of today, on Product Quest's website, http://www.productquestmfg.com/, Todd Kwait is listed as President and John Regan is listed as CEO. Lastly, note Todd Kwait's address on the 2008 and 2013 PQM LLC report filed with the Florida Secretary of State...23230 Chagrin Blvd. Country club fees and all meals at country club were paid for by corporate funds. The club was called the Sunset Harbor Yacht Club. It just closed down last month in 1/2014. Martello inspected monthly invoices that were paid out of the PQM funds to this yacht club.

---

[1] Both Todd Kwait and Robert J. Kwait are principals of Product Quest. Todd Kwait works with Robert J. Kwait (Todd's father is Robert J. Kwait).

Pages of meals and expenditures were listed on each monthly invoice. Evidence will be proffered at the hearing to prove these instances of intentional misconduct.

PQM performed a "shell game" with money. One of their entities, Product Quest Logistics appears to be laundering foreign currency and not paying taxes on it. With the bank statements that were produced by PQM in supplemental production in January 2014 (after Plaintiff's expert wrote his first 2 reports), it is apparent that funds come in from Finland from a company called Lumene Oy and those same funds go out of the bank account to another PQM bank account with a complete zeroing out of the bank account every month.

A similar game was played with a larger PQM bank account with more funds. One entry (that was not redacted) reveals that funds came in from the Isle of Man. Funds would go out to various PQM bank accounts and then come back in which included the transferring of funds from the Product Quest Logistics foreign funds to this same bank account.

The shell game with money can also be illustrated by the deposit slips provided by Defendants which show funds going in and out of various corporate entities. Defendants have no respect for corporate entities at all (whether or not they are dissolved). In fact Defendant Regan had no explanation for why over $ 1.5 million dollars for the sale of DJMP skin care products were deposited into an account for a dissolved corporation.

**Count VII. Plaintiff's Fraud Claims**

Fraud in the inducement took place and post-contractual fraud took place in that Plaintiffs were told by Regan that one entity would exist at the end of the conversion and that 100% of Product Quest Manufacturing, Inc.'s assets would be transferred to PQM LLC once it was formed. Furthermore, PQM's fraudulent behavior violates the Florida Deceptive and Unfair Trade Practices Act. Defendants represented that they were doing all the "blend and fill" work when in actuality it was being performed by LF of America for the "blend and fill" of Daily Measures, the number one seller in the DJMP line and the

number 2 seller throughout Walgreens nationally. Defendant Regan lied throughout his deposition stating that the joint venture DJMP was charged costs for componentry when evidence reveals otherwise.

## CONCLUSION

From the evidence proffered, it appears that "intentional misconduct" occurred. Defendants had actual knowledge of the wrongfulness of the conduct and the high probability that injury or damage to Plaintiff would result. Despite that knowledge, Defendants intentionally pursued that course of conduct which resulted in injury or damage to Plaintiff.

For the reasons described above, Plaintiff respectfully requests that this Honorable Court accept Plaintiffs proffer of evidence as a reasonable basis for punitive damages.

Respectfully submitted,

*Jeannette Martello*

Jeannette Martello, Plaintiff, *In Pro Se*

## CERTIFICATE OF SERVICE

### Martello vs. Product Quest et al, Case number 6:12-cv-1304-Orl-22GJK

I hereby certify that the **Plaintiff's Evidentiary Proffer with Exhibits** will be hand delivered to Mr. Robert Norway and Mr. Rick Mitchell of the law firm of Gray Robinson at their offices located at Gray Robinson, 301 E. Pine Street, Suite 1400, Orlando, Florida 32801.

*Jeannette Martello*

Jeannette Martello, Plaintiff, In Pro Se

P.O. Box 914

South Pasadena, CA 91031

drmartello@gmail.com

(626) 993-8501