RECEIVED

United States District Court
Middle District of Florida
Orlando Division

2014 MAY 20  PM 4: 43

U.S. DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO, FLORIDA

Jeannette Martello, Plaintiff, *In Pro Se*

6:12-CV-1304-ORL-22-GJK

v.

Product Quest Manufacturing, LLC; et al.
Defendant(s)

## PLAINTIFF'S CLAIMS AND DAMAGES SECTION TO
## THE JOINT PRETRIAL STATEMENT

### Count I, Breach of Contract, Accounting

Plaintiff has demanded an accounting and, to date, has not received a full accounting of

the books due to spoliation or concealment.

### A.  Creation of Two Quick Books' Files for Dr. Jeannette Martello Products' LLC

A review of the DJMP Quick Books file produced by Defendants reveals that an Audit

Trail report could be generated which indicates when entries were made for the *first time* and

when the entries were *last modified.*  This report reveals that pages of entries were made for the

first time ever on January 17, 2012 for services and goods rendered five years prior.  According

to Defendants' explanation, name changes were the reason for these 2012 Audit Trail flags.  The

reality is that the name changes between "Product Quest Manufacturing LLC" and "PRODUCT

QUEST MFG., LLC" present on Defendants' invoices were not reflected in the Audit Trail

report.

Two different sets of Quick Books DJMP's accountings exist:  one set of books was

given to Plaintiff and another set was maintained by Defendants.  This is the only explanation for

the fact that Audit Trail doesn't reflect the name changes between the invoices produced by Defendants. It appears that Defendants' motive for maintaining separate books was to misrepresent to Plaintiff that DJMP sales income was less than it was. This ulterior motive is fortified by the fact that Defendants continued to sell DJMP skin care products to Walgreens through both PQM, Inc. and PQM, LLC entity after the fraudulently represented "conversion".

This affirmative act of Quick Books alteration caused the loss of the real financial information. The reasons for this spoliation cannot be credibly explained as not involving bad faith.

**B. Proof of Invoice Creation after Litigation Hold**

A litigation hold should have been placed as early as December 15, 2010 when attorney Greg Snell gave Defendants the "heads up" that Plaintiff was looking for legal representation to obtain financial records. Several invoices were altered. Invoice 51176 was created after a litigation hold should have been placed by Defendants because it lists the name of the plaintiff entity *JYM, LLC* instead of listing the name of the DJMP joint venture in the body of the invoice. In another example, a 12/6/2006 purchase order 32588 was created after a litigation hold should have been placed. The top of this purchase order lists "Product Quest Manufacturing LLC", an entity that wasn't created until *March 27, 2007*.

**C. Defendants' Failure to Produce Walgreens' Purchase Orders**

Plaintiff demanded purchase orders on January 5, 2007. In response, PQM principal Kwait declared, "[W]ith respect for your (sic) request of copies of all purchase orders, please note that purchase orders are submitted by Walgreens electronically via EDI. We can provide a listing, *but hard purchase orders are not generated by email or any other sort of transmission." (emphasis added).* Kwait intentionally misrepresented a material fact that he

knew was false when he made it that "hard purchase orders are not generated by email or any other sort of transmission."

During his January 23, 2014 deposition, PQM's Chief Financial Officer Jennings testified that Defendants use True Commerce for their Electronic Data Interchange. On March 7, 2014, Plaintiff spoke with a True Commerce representative who told her that *True Commerce EDI purchase orders can be printed out and saved in PDF format.* Defendants have engaged in bad faith discovery misconduct by intentionally concealing and withholding Walgreens' purchase orders. The Walgreens purchase orders will indicate what the gross sales were for DJMP skin care products. Since the parties agreed to a 50/50 net profit split, these purchase orders are of utmost importance. Defendants have intentionally, willfully and in bad faith withheld crucial evidence of Walgreens purchase orders and this withholding of evidence has substantially prejudiced Plaintiffs.

### D.  Defendants' Deficient Document Production

Plaintiffs requested inspection of all documents relating to the DJMP joint venture from March 2006 onward. These papers were inspected, copied and scanned during a few trips. The document inspection was deficient. Receipts, cancelled checks and proof that PQM paid for expenses that it claimed was not present for well over 99% of the over $ 2 million in expenses claimed. No cancelled checks were produced that had been written from the DJMP bank account to PQM. During his deposition, Defendants' CFO Jennings claimed that he did not order the missing bank statements or cancelled checks because they cost $ 5 a copy. In another example, a handful of Roadway and UPS invoices were produced that should have corroborated freight bills totaling $ 253,467.86, but instead backed up a mere fraction of these expenditures.

### E. Defendants' Spoliation Through Concealment of 2006 Financial Records

Defendants intentionally, willfully and in bad faith concealed crucial 2006 financial record evidence. This concealment has substantially prejudiced plaintiffs. Defendants' principal Kwait noted that as of January 4, 2007 that PQM had expended over $1,294,690.71. If these expenditures were not made on behalf of DJMP, that would increase Plaintiffs' damages to 50% of $1,294,690.71 or to $ 647,345.35.

Furthermore, if the 2006 financial records and vendor files had been produced and did not indicate that expenses were paid for by Product Quest on behalf of DJMP, the fraud claim could be proven which would involve punitive damages.

### F. Defendants' Incomplete Production of Bank Records

Defendants intentionally withheld the existence of at least three different bank accounts which were used to conduct business on behalf of DJMP. This withholding of banking information and bank accounts was proven during Regan's deposition. Defendants have not produced a single bank statement for the 3471 bank account in which over $ 1.56 million dollars was deposited. The $ 1,567,802.98 was written in checks by the DJMP joint venture to PQM. In reality, a handful of bank statements from years during which DJMP products were not sold to Walgreens (2009 and 2010) were produced.

### Count II. Breach of Contract: Nepotism

Defendant Regan's sister Christine Lunday relayed to Martello that she had just gone through a divorce and that she was grateful that her brother John had found a job for her with his company PQM. Lunday also made it clear to Plaintiff that she performed the marketing for several other non-DJMP skin care lines produced by PQM.

Bill Jennings, PQM's CFO testified that no other agent of PQM was paid for out of DJMP's funds. Defendants concealed the fact that marketing was being paid for by DJMP as opposed to by PQM. In his letter regarding expenses, Todd Kwait listed Imogene Communications. Nowhere did he list Christine Lunday's name. Jennings also revealed that PQM normally pays Christine Lunday.

Defendants tried to conceal this nepotism. Whenever DJMP was invoiced, the name Imogene Communications appeared at the top. These invoices became available in late 2010. When Lunday invoiced PQM, she used her full name Christine Lunday and not Imogene Communications.

Plaintiff tried to get PQM to hire an experienced publicist to spearhead the DJMP marketing effort. Even though Katie Steines would have been a great marketing expert for the DJMP products, she was passed over by PQM in favor of Defendant Regan's sister, Christine Lunday. Defendant Regan breached his fiduciary duties when he chose his sister Christine Lunday who was a novice sales person instead of choosing expert Steines.

**Todd Kwait's "Connection with" Nevessa Production**

PQM decided that it would be a good idea to produce a video for the launch. Plaintiff was told that the video would be filmed at PQM Principal Todd Kwait's studio and with his team. Defendants represented that Kwait had a "connection" with a video company. Kwait is the owner of Ezzie Films, LLC and Kingswood Records, both of which record at Nevessa Production in Woodstock. After obtaining copies of the general ledgers in late 2010, Martello learned that Todd Kwait had a conflict of interest when PQM paid Nevessa for video production.

Defendants breached their duties of loyalty, due care, prudence by using Nevessa to produce the video simply because Kwait had a connection with the company. In fact, the poor quality video was not fully used by The Company for its intended marketing purposes.

## Count III. Breach of Contract: Formulation

None of the DJMP products were ever mailed to Martello prior to going on sale. After Martello first sampled the DJMP products, she was not pleased with what she discovered: the Lathering Cleanser was oily and left a slimy feeling on her skin. Most importantly, though, the cleanser burned the eyes. Martello brought up her findings at the next PQM conference call. In response to Martello's concern over the Lathering Cleanser burning the eyes, Defendant Regan said, "[O]h, yeah. We put too much surfactant in it. We had to reformulate it." Regan also said that the folks at Walgreens had already alerted him to the fact that the cleanser burned the eyes.

Martello was informed by Regan that the cleanser was re-formulated to decrease the amount of surfactant put into it. Nevertheless, nearly a year later, Martello received a concerning email from a disgruntled Walgreens' customer who asked for a refund and expressed her displeasure with the fact that the lathering cleanser burned her eyes.

If Martello had been sent samples of the DJMP skin care products prior to their hitting the shelves, the fact that the lathering cleanser burned the eyes could have been solved before thousands of dollars were expended on a defective and dangerous product. PQM, on the other hand, had nothing to lose. PQM made money no matter what. In fact, the more product that Product Quest Manufacturing produced, the more money it made since the contract provided for a 30% markup for the production of all DJMP products.

## Count IV. Breach of Contract: Walgreens' Contract and Purchase Orders

Paragraph 2, page 1 of the Operating Agreement that was drafted by Defendants. This paragraph reads, "[T]he Managing Members will actively participate in all decisions as they relate to the development of and approval of all pricing, *purchase orders and/or contracts*." *(emphasis added).* Next, addressing Section 5.35 of the Operating Agreement which reads that "the following actions shall be taken by the Managers *only with the unanimous consent of the Members:* (e) Notwithstanding any provision to the contrary, entering into *any agreement with Walgreens drug stores." (emphasis added).*

Walgreens' vendor agreement was finally produced and revealed that it was revised on January 30, 2006, the same date that the parties signed the contract. Defendant Regan signed the Walgreens' vendor agreement for the first time on April 6, 2006, three months after the parties entered into their agreement. Plaintiff never actively participated in the negotiation of Walgreens' vendor agreement nor did she consent to it.

To date, Martello has yet to see a single purchase order from Walgreens to PQM. According to the Uniform Commercial Code which governs the relationship and business between two experienced merchants like Walgreens and PQM, every purchase order is a contract. *MidAtlantic International, Inc. v. AGC Flat Glass North America, Inc.,* No. 2:12cv169, (Eastern District of Virginia, February 7, 2014). Plaintiff did not actively participate in nor did she give her consent to a single purchase order or contract.

## Count V. Distribution of Profits

PQM breached its contract with Plaintiff by paying itself more for "expenses" which decreased the amount of net profits that were available for distributions. This padding of expenses took place in several different ways. First, the cost of fill alone was over $ 900,000.

Defendants' expert O'Toole opined that contracting out of labor was not provided for in any provision of the contract. In fact, PQM created invoices for the blend and fill of Daily Measures, work that was actually performed by third party LF of America.

PQM was charged 58 cents for the blend and fill of Daily Measures. Defendants created fraudulent invoices that PQM "blended and filled" for work actually performed by LF of America. PQM then turned around and invoiced DJMP $ 2.51 for the same work that they did not perform.

Throughout his deposition, Defendant Regan made a point of saying that he charged cost for everything else. This is simply not the case. PQM was charged 5 cents per ampule by LF of America. PQM then turned around and charged DJMP 83 cents per ampule for those very same ampules.

Defendants note that "DJMP's profit and loss statements show that the LLC "made a net profit" in only a single fiscal year, 2007. This can't be verified to be true.

## Count VI.  Breach of Fiduciary Duties of Good Faith and Fair Dealing, Duty of Loyalty and Duty of Care

An implied covenant of good faith and fair dealing exists in every single contract. The duties of loyalty and care does not limit to whom these duties are owed. Under Section 608 of the Florida Limited Liability Act, there are many more duties and obligations that are documented than those that appear at Section 608.4225. For example, there is an entire section on non-waivable provisions that stresses that the duties of loyalty, care, good faith and faith dealing can't be waived.

The parties executed the contract on January 30, 2006, two months before the DJMP, LLC was formed. Therefore, by definition, there were no "members of the LLC" until the

DJMP, LLC was formed on March 10, 2006. Martello is also an economic interest owner. Plaintiff is a party to the written contract.

The Operating Agreement and License Agreement are legally considered a single document according to the language of written contract drafted by Defendants. Defendants owed duties and obligations to Martello, the individual and JYM, LLC. The third paragraph of page 1 of the Operating Agreement notes that "[S]uch grant of license is embodied in a "License Agreement" attached hereto as Exhibit C signed in conjunction with this Operating Agreement and made a part hereof. The License Agreement contains an "INCORPORATION BY REFERENCE" section on paragraph 9 which reads, "[T]he parties hereto agree to incorporate all the provision, sections and clauses of the "DR. JEANNETTE MARTELLO PRODUCTS, LLC OPERATING AGREEMENT" into their Agreement in its entirety and vice versa." Page 1 of the License Agreement, stresses in paragraph E, "WHEREAS, Celebrity agrees to grant a license to Company to use her likeness, image, name and voice and to provide her services to endorse and promote the products and the Company for Walgreens drug stores *under the terms and condition of the Agreement and the "DR. JEANNETTE MARTELLO Operating Agreement" ("Operating Agreement").*

Defendants and Plaintiff were involved in a fiduciary relationship. When this type of relationship exists, both the Eleventh Circuit and Florida Courts stress that duties can't be waived between the parties. These non-waivable duties of loyalty, care, good faith and fair dealing were breached by Defendants.

## Count VII. Misappropriation of Plaintiff's Name

The first sale doctrine is considered an affirmative defense in Florida and in the Eleventh Circuit. Defendant waived this affirmative defense when it was not pled. When Defendants

asked to amend their pleading, they did not move to add the "first sale" doctrine. The "first sale" doctrine does not apply to this situation because Martello and JYM, LLC never gave authorization to use her name or likeness for the sale of non-DJMP products that it was used to promote. Martello's name was used to sell several non-DJMP skin care products that were produced by Defendants. According to the contract, Martello was to give her written authorization for her name and likeness to be used on any products for promotion. PQM never approached Martello to use her name or likeness in the sale of any non-DJMP products.

## Count VIII. Violation of Lanham Act

Plaintiff owns a common law trademark right in her name which has acquired secondary meaning. Martello expended over a million dollars to promote it. Martello was the creator of and Editor-in-Chief of nationally distributed Skin Deep Magazine, had already appeared on several national television shows and already had two nationally broadcast radio shows at the time that Defendants approached her. Martello's name had acquired secondary meaning as being associated with "all things cosmetic" long before PQM approached her for this joint venture.

With respect to the trade dress analysis which is treated similarly to trademark analysis, discovery has revealed that Defendants intentionally infringed upon the trade dress of the DJMP skin care products when it created the Mineral Matters line of skin care products.

Actual confusion existed due to Defendants intentional infringement of Plaintiff's trademark and intentional infringement of DJMP products' trade dress. Three Walgreens' customers wrote to Plaintiff documenting actual confusion. Each of these customers bought Mineral Matters since they each thought the non-DJMP products were part of Martello's line up and since Mineral Matters packaging was so similar to the packaging of DJMP skin care products.

## Counts IX through XVI.  Piercing the Corporate Veil.

Defendant Regan used the corporate entity for improper purposes which the Courts recognize includes the commingling of funds.  Corporate funds were used to purchase a kitty bed and declare it as a corporate expenditure.  Corporate funds were used to pay for child support.  Private office rent for other Ohio corporate entities owned by PQM Principals was paid for out of Product Quest Manufacturing corporate funds for the private offices of Robert J. Kwait and Associates, Kingswood Records, LLC and Ezzie Films, LLC.  Country club and yacht fees for the Sunset Harbor Yacht Club were paid out of the PQM corporate funds.

PQM performed a "shell game" with money for improper purposes.  One of their entities, Product Quest Logistics appears to be laundering foreign currency and not paying taxes on it.  With the bank statements that were produced by PQM in supplemental production in January 2014, it is apparent that funds come in from Finland from a company called Lumene Oy and those same funds go out of the bank account to another PQM bank account with a complete zeroing out of the bank account every month.

A similar game was played with a larger PQM bank account.  One entry reveals that funds came in from the Isle of Man, a known tax haven.  Funds would go out to various PQM bank accounts and then come back in which included the transferring of funds from the Product Quest Logistics foreign funds to this same bank account.

An argument for undercapitalization supports the alter ego theory. In his email, Defendant Regan made it clear that he needed to partner up with Stephen's Capital Partners in order to continue to do business with Walgreens. In further support of the alter ego theory, Article III, section b of the Operating Agreement stressed that PQM would be the exclusive

manufacturer of DJMP skin care products unless Defendant Regan ceased to be "involved in the senior management of Product Quest."

## Count XVII. Fraud

Fraud in the inducement exists in that Defendant Regan intentionally misrepresented that marketing expenses would be covered by the industry-wide used cost formula present in the written contract Relying upon these fraudulent misrepresentations, Plaintiff entered into an agreement with Defendants.

Post contractual fraud also occurred. In a phone call and via an email, Defendant Regan that 100% of Product Quest Manufacturing, Inc.'s assets would be transferred to PQM LLC. Discovery has revealed that this was not the case. Defendant intentionally misrepresented this material fact in order to coerce Plaintiff to sign a Mutual Consent so that he could receive millions of dollars in financial backing from Stephens Capital Partners. In actuality, both the corporation and the LLC continued to sell DJMP skin care products to Walgreens after the formation of PQM, LLC.

Defendant Regan also perpetrated a fraud when he represented that the joint venture DJMP would be charged "cost" for everything except for the charges for the "blend and fill" of product. In reality several examples of overcharging exist. Only two will be pointed out: 1) the DJMP joint venture was charged $ 2.51 for "blend and fill" that cost PQM 58 cents through a third party and 2) DJMP was charged 83 cents per ampule when PQM was charged 5 cents for that same ampule.

# DAMAGES

Plaintiff's expert Charles P. Adams has written three separate reports because Defendants' financial records have been piecemealed out throughout this litigation. To date, Defendants have failed to produce a single Walgreens purchase order although it has been proven through discovery that purchase orders can be saved in pdf format and printed out. Defendants concealed all of the vendor files for the entire year of 2006 which could have corroborated claimed expenditures of $ 1,294,690.71. Defendants have produced a handful of bank statements for a few months in 2009 and 2010 even though DJMP skin care products were on sale at Walgreens during 2006 and 2008.

With the dearth of the information provided to Plaintiff, expert Charles Adams has ascertained that total economic damages in this case amount to $ 1,316,490.09. The damages include over charges of $ 639,419.20 for the fact that Defendants claimed to have performed the "blend and fill" for Daily Measures on the same batches of chemicals and during the same time period when the work was actually performed by third party LF of America. Damages include excess inventory that was produced and written off by Defendants (Defendants made money no matter what since they produced the product with a margin that was written into the contract that they drafted). Damages include lost profits on inventory written off according to the amount predicted in an email from Defendant Regan to Plaintiff. Damages also included unauthorized expenses that were claimed by Defendants.

Respectfully submitted,

_Jeannette Martello_

Jeannette Martello, Plaintiff, *In Pro Se*

## CERTIFICATE OF SERVICE

### Martello vs. Product Quest et al, Case number 6:12-cv-1304-Orl-22GJK

I hereby certify that the **Plaintiff's ~~Response~~ Filing of The Joint Pretrial Statement's Claims and Damages Section** will be hand delivered to Mr. Robert Norway and Mr. Rick Mitchell of the law firm of Gray Robinson at their offices located at Gray Robinson, 301 E. Pine Street, Suite 1400, Orlando, Florida 32801.

*Jeannette Martello*

Jeannette Martello, Plaintiff, In Pro Se

P.O. Box 914

South Pasadena, CA 91031

drmartello@gmail.com

(626) 993-8501